Gerald L. Warren, OSB #814146
gwarren@geraldwarrenlaw.com
Law Office of Gerald L. Warren
901 Capitol St. NE
Salem, OR 97301
    Telephone: (503) 480-7250
    Fax: (503) 779-2716

Jennifer M. Gaddis, OSB #071194
jgaddis@cityofsalem.net
City of Salem Legal Department
555 Liberty St. SE, Room 205
Salem, OR 97301
    Telephone: (503) 599-6003
    Fax: (503) 361-2202
      Attorneys for Defendants City of Salem,
      Powers, Moore and Ramirez

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ELEAQIA MCCRAE, | Case No. 6:20-cv-1489-MC |
| Plaintiff, | |
| v. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF SALEM; MAYOR CHUCK BENNETT; CITY MANAGER STEVE POWERS; POLICE CHIEF JERRY MOORE; OFFICER RAMIREZ; OFFICERS JANE OR JOHN DOES 1-21, all in their official and individual capacities, | |
| Defendants. | |

## LR 7-1 CERTIFICATION

Pursuant to LR 7-1(a)1A, the parties have made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so.

Page 1 – **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## **MOTION**

Defendants move the Court under Fed. R. Civ. P. 56 for Summary Judgment against plaintiff on all claims on the grounds that there is no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law.

In support of this Motion, defendants rely on:

1. The pleadings on file;

2. The Declaration of Gerald Moore;

3. The Declaration of Robert Johnston;

4. The Declaration of Kevin Ramirez;

5. The Declaration of Trevor Morrison;

6. The Declaration of Jason Van Meter;

7. The Declaration of Jeffrey Keniston;

8. The Declaration of Jon Garland;

9. The Declaration of Michael Adams;

10. The Declaration of Joshua Buker;

11. The Declaration of Grant Foster;

12. The Declaration of Cort Kirksey;

13. The Declaration of Vincennt Salazar;

14. The Declaration of Tristan Ferrill;

15. The Declaration of Jacob Schofield;

16. The Declaration of Albert Hodges;

17. The Declaration of David Smith;

18. The Declaration of Jenny Coduti;

19. The Declaration of Gerald L. Warren; and

20. The Memorandum of Law below.

# TABLE OF CONTENTS

MOTION ................................................................................................................ 2

TABLE OF AUTHORITIES ................................................................................. 5

INTRODUCTION .................................................................................................. 7

UNDISPUTED RELEVANT FACTS .................................................................... 8

    May 31, 2020 ................................................................................................... 9

    Center and Marion Street Bridges ................................................................. 10

    Protest Turns Violent and Unlawful Assembly Declared ............................. 12

    Less-Lethal Munitions Authorized to Disperse The Crowd .......................... 16

    Stinger Rounds .............................................................................................. 17

    Plaintiff Struck By Projectile Thrown from Crowd ...................................... 18

    Immediate Medical Care ............................................................................... 20

SUMMARY JUDGMENT STANDARD ............................................................. 21

ARGUMENTS ..................................................................................................... 22

FEDERAL CLAIMS

I.    §1983 Claim – First Amendment ................................................................. 22

    A.    Plaintiff Was Not Engaged in A Constitutionally Protected Activity At The Time of Her Injury .................................................................... 22

    B.    Motivating Factor Was Unlawful Activity, Not Lawful Protest ................ 26

II.    §1983 Claim – Fourth Amendment .............................................................. 27

    A.    Officer Johnston Did Not Seize Plaintiff ................................................ 28

    B.    Officer Johnston's Use of Force Was Reasonable .................................. 30

       1.     Nature and Quality of Intrusion – Immediate Force Deployed Against Crowd.................................................................................................30

       2.     Governmental Interest – Significant .................................................31

            a.    Severity of Crimes Was Significant, Including Both Felonies and Misdemeanors ........................................................................31

            b.    Plaintiff and the crowd around her posed an immediate threat to the safety of the officers and others .................................32

            c.    Plaintiff and the crowd around her failed to comply with lawful order to disperse ........................................................33

   C.    Officer Ramirez Did Not Seize Plaintiff.................................................34

III.   Defendants Powers and Moore Cannot Be Held Liable Under A Theory of Respondeat Superior .......................................................................................................37

IV.   Defendant Officers Are Entitled To Qualified Immunity.....................................38

V.    There is No *Monell* Liability Under These Facts.................................................39

VI.   A §1981 Claim is Generally Reserved for Contractual Relationships ................44

VII.  Claim for Declaratory Judgment is Redundant....................................................45

STATE CLAIMS

I.    Oregon Tort Claims Act......................................................................................46

   A.    Individually Named Defendants Must Be Dismissed................................46

   B.    Immunity for Defendants Arising from Riot, Civil Commotion or Mob Action ........46

II.   Intentional Torts – Assault, Battery, IIED ..........................................................47

   A.    Sixth and Seventh Claims – Battery and Assault.......................................47

   B.    Intentional Infliction of Emotional Distress .............................................47

III.   Negligence ..........................................................................................................48

CONCLUSION........................................................................................................49

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 22

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................................................... 38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 37

*Astre v. McQuaid*, 804 Fed. Appx. 665 (9th Cir. 2020) ............................................................... 44

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................................................ 27

*Cady v. Dombrowski,* 413 U.S. 433 (1973) .................................................................................. 35

*Cantwell v. State of Connecticut*, 310 U.S. 296 (1940) ............................................................... 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 21, 22

*Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) .......................................................................... 27, 32

*Connick v. Thompson*, 563 U.S. 51 (2011) ................................................................................... 42

*Cook v. Kinzua Pine Mills Co.*, 207 Or. 34 (1956) ...................................................................... 47

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006) ............................................................ 44

*Fed. Election Comm'n. v. Toledano*, 317 F.3d 939 (9th Cir. 2002) ............................................. 29

*Florida v. Bostick*, 501 U.S. 429 (1991) ....................................................................................... 35

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992) ..................................................................... 40

*Graham v. Connor*, 490 U.S. 386 (1989) ............................................................................... 27, 28

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................................. 23, 26

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) ............................... 23

*Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784 (9th Cir. 2016) ...................................................... 42

*Malley v. Briggs*, 475 U.S. 335 (1986) ......................................................................................... 38

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................... 22

*McGanty v. Staudenraus,* 321 Or. 532 (1995) ................................................................. 47

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005)................................. 24, 31, 34

*Merritt v. Cty. of Los Angeles*, 875 F.2d 765 (9th Cir. 1989) ..................................... 42

*Monell v. Dept. of Soc. Services*, 436 U.S. 658 (1978)................................................ 39

*Mullenix v. Luna*, 136 S. Ct. 305 (2015).......................................................................... 38

*Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995)....................................................... 41, 42, 43

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ............................... 28, 31, 33, 34

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ....................................................................... 23

*O'Brien v. Welty*, 818 F.3d 920 (9th Cir. 2016)............................................................. 23

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237 (1952) ......................... 45

*Societe de Conditionnement v. Hunter Eng. Co., Inc.*, 655 F.2d 938 (9th Cir. 1981) ................. 45

*Son v. Ashland Community Healthcare Services*, 239 Or. App. 495 (2010) ............................... 48

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) .......................................................... 22, 37

*Tennessee v. Garner,* 471 U.S. 105 (1985)..................................................................... 27

*Terry v. Ohio*, 392 U.S. 1 (1968) ..................................................................................... 36

*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996)................................................................ 40

*TW Elec. Service Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626 (9th Cir. 1987) .......... 22

*United States v. Cervantes,* 703 F.3d 1135 (9th Cir. 2012) ......................................... 35

*United States v. Erickson*, 991 F.2d 529 (9th Cir. 1993) ............................................. 35

*Young v. Cty. of Los Angeles,*  655 F.3d 1156 (9th Cir. 2011) .................................... 30

**Statutes**

28 U.S.C. § 2201.................................................................................................................... 45

42 U.S.C. § 1981 ................................................................................................. 44

ORS 30.265(3) ..................................................................................................... 46

ORS 30.265(4) ..................................................................................................... 46

ORS 30.265(6)(e) ............................................................................................ 8, 46

ORS 30.265(6)(f) .................................................................................................. 47

ORS 131.675 ........................................................................................................ 14

ORS 163.208 ........................................................................................................ 31

ORS 164.245 ........................................................................................................ 31

ORS 166.015 ........................................................................................................ 31

ORS 166.025 ........................................................................................................ 31

ORS 166.116 ........................................................................................................ 31

**Rules**

Fed. R. Civ. P. 56 ................................................................................................. 2

Fed. R. Civ. P. 56(c) ........................................................................................... 21

Fed. R. Civ. P. 56(e) ........................................................................................... 22

## <u>MEMORANDUM OF LAW</u>

### <u>INTRODUCTION</u>

This case involves an eye injury plaintiff sustained while protesting George Floyd's death in downtown Salem, Oregon, on Sunday, May 31, 2020. What began as a lawful protest became an unlawful assembly and a riotous crowd throwing objects at police. Plaintiff claims the City of Salem, City Manager Steve Powers, retired Police Chief Jerry Moore, Officer Kevin Ramirez and Officer Robert Johnston (collectively "City defendants") violated her constitutional, federal, and state rights by "intentionally" shooting her in the eye for being black and peacefully

engaging in free speech.[1] All claims should be dismissed against all defendants because plaintiff was in a group that was engaged in a violent, unlawful protest when she was struck with an object thrown by another protester who was apparently attempting to assault police officers. Furthermore, plaintiff does not have sufficient grounds to support a Monell claim against the City. Finally, the individual officers, at a minimum, should be granted qualified immunity on plaintiff's federal claims and the City is entitled to immunity under the Oregon Tort Claims Act for plaintiff's tort claims since they all arise from or were done to prevent a "riot, civil commotion or mob action." ORS 30.265(6)(e).

## UNDISPUTED RELEVANT FACTS

The day prior to plaintiff's injury, Saturday, May 30, 2020, there was civil unrest within the City of Salem, Oregon, including protesters throwing bricks, rocks, glass bottles, eggs, firework mortars, and other items at police. (Moore Decl., ¶ 3). There were also reports of vandalism in and around downtown Salem. *Id.* "This group [of protesters] was extremely violent and intentional in the acts against police officers in general." (Morrison Decl., Ex. 1, p. 1). Due to the level of violence and size of the crowd, Salem Police Department deployed chlorobenzylidene malononitrile ("CS gas") as one of its tactics to disperse the crowd. (Moore Decl., ¶ 4). Salem Police Chief at that time, Gerald Moore, "had never seen that level of violence from a protesting crowd" in his 15 years as Chief. *Id.* It was the first time Salem Police Department ("SPD") had ever deployed CS gas during a protest within its jurisdiction. *Id.*

In response to the Saturday, May 30, 2020 protest, Defendant City Manager Steve Powers issued a Declaration of Emergency and Order, initially implementing a curfew for May

---

[1] Plaintiff dropped her claims against Mayor Chuck Bennett in her First Amended Complaint and claims against him are not addressed in this motion.

30, 2020, May 31, 2020, and June 1, 2020. (Warren Decl., Ex. 1, p. 3, Powers Depo.). The purpose of the Order was to protect community safety and "the rights of individuals to peacefully protest and demonstrate." (*Id.* at p. 4). A curfew was enacted "to provide a method for the police department to have crowds of people disperse to maintain public safety and avoid property damage and physical injuries." (*Id.* at p. 6). The City Manager elected to cancel the curfew order on the day of this incident, May 31, 2020, "hoping that protests would return to a peaceful demonstration of people's rights to express their displeasure regarding what was happening across the country with policing." (Warren Decl., Ex. 1, p. 6) (Moore Decl., ¶ 5). Unfortunately, the May 31, 2020 protest did not remain peaceful as City leaders had hoped.

*May 31, 2020*

Salem Police Department personnel were aware protesters planned an event in the City on May 31, 2020. Consistent with past practice numerous attempts were made "by the Salem Police Department to communicate with protest organizers to understand the intent of the protest and to determine how the police department could support the safe exercise of protesters' First Amendment rights. The attempts to locate or communicate with the protest organizers were unsuccessful." (Van Meter Decl., ¶ 7).

Plaintiff learned about the May 31, 2020 protest while it was happening, when her friend broadcasted it on a social media platform, Instagram Live. (Warren Decl., Ex. 6, p. 5, McCrae Depo.). Plaintiff drove herself, her sister, and a friend to the Oregon State Capitol mall area to join the demonstration. (*Id.* at p. 6). They arrived at approximately 7:30 p.m. (*Id.* at p. 5). The protest was peaceful when plaintiff arrived. Plaintiff lawfully stood on the sidewalk with others, making and displaying protest signs. (*Id.* at p. 7).

Shortly before 9:00 p.m., as it grew dark, plaintiff and the other protesters left the Capitol Mall area and marched westbound through downtown Salem toward the Marion Street Bridge. (Warren Decl., Ex. 6, pp. 7, 9) (Van Meter Decl., Ex. 2, map). The group marched up the Front Street on-ramp to the Marion Street bridge and "completely occupied the bridge and blocked all vehicles for some time." (Van Meter Decl., ¶ 4). Plaintiff participated in the unlawful occupation of the Marion Street Bridge. (Warren Decl., Ex. 6, pp. 9, 11) ("we all stopped at the top [of the bridge]" … Q. "Were you blocking cars?" A. "I'm assuming.").  As further explained below, the protesters' act in occupying the bridge created an actual and imminent threat to public safety, requiring the Salem PD Mobile Response Team ("MRT") to be activated. (Moore Decl., Ex. 1, p. 7).

### *Center and Marion Street Bridges*

West Salem is uniquely separated from the majority of the City by the Willamette River. (Van Meter Decl., ¶ 4, Ex. 2, map). West Salem residents are served by Salem Emergency Police, Fire, and Ambulance Services located across the river. (Van Meter Decl., ¶ 4). Moreover, the nearest hospital (Salem Hospital) is located across the Willamette River in downtown Salem. *Id.* (Van Meter Decl., Ex. 2, map). Only two one-way bridges provide access between Salem and West Salem. *Id.* The Center Street Bridge runs west to east, bringing traffic from West Salem to the center of downtown Salem. *Id.* The Marion Street Bridge runs east to west, taking traffic from downtown Salem to West Salem and points west. *Id.*

If either bridge becomes impassable, emergency vehicles must divert their travel several miles through Independence, Oregon, to cross the river by road. (Van Meter Decl., ¶ 4) (Warren Decl., Ex. 2, pp. 4-5, Moore Depo.). Normally, West Salem is located less than 10 minutes from the Salem Hospital, Salem Fire Department, and Salem Police Department. (Van Meter Decl.,

Ex. 1, p. 1). However, when the Marion Street and/or Center Street Bridges are obstructed and vehicles are forced to travel through Independence, an additional 30 minutes is required – *each* way. (Van Meter Decl., Ex. 1, p. 2). This creates a perilous situation for those requiring emergency services.

Because the two bridges precariously serve the City's transportation demands, "the community has been discussing whether, where, and how to construct a third vehicular bridge across the Willamette River for decades." (Warren Decl., Ex. 9, p. 4). More recently, the "Salem Riverfront Crossing Project" gathered community partners to address the serious need for a third bridge to "improve mobility and safety for people … across the Willamette River in the Salem-Keizer metropolitan area while alleviating congestion on the Center Street and Marion Street Bridges …." *Id*. at p. 2.

The Salem Police Department performs the critical role of keeping the two existing bridges clear for the safety of the public. With approximately 30,000 people living in West Salem, the bridges are vital infrastructure and SPD "makes every effort to control the bridges so that [protesters] don't have the [ability] … to make it difficult for emergency vehicles, ambulances, fire trucks, [and] the general public to get into the other side of the river." (Warren Decl., Ex. 2, p. 3).

On May 31, 2020, as Officer Morrison documented in his Incident Report:

… the group marching made it to the Marion St Bridge, blocking traffic and [creating] a public safety hazard. This was an un-permitted march at its inception but was allowed due to the fact that they were peaceful. However, both Center and Marion St Bridges are the only way traffic can flow in and out of Salem. This includes public transportation, emergency vehicles, and citizens coming and going. I know by blocking the bridge it can prevent [a] person from getting medical attention and access to life prevention measures. Not to mention the impact on vehicle travel coming and going out of the city. This was around [9:03 p.m.].

(Morrison Decl., Ex. 1, p. 1).

In direct response to protesters occupying the bridge, members of the SPD MRT were deployed to "[p]rotect critical infrastructure, specifically the bridge." (Warren Decl., Ex. 3, p. 4, Van Meter Depo.). "Lt. Van Meter directed all of Salem MRT and Salem SWAT to stage in the parking lot of Rite Aid [located directly between the Marion and Center Street Bridges] to prevent participants of the march from shutting down anymore bridges." (Morrison Decl., Ex. 1, p. 2). As the MRT got into position to secure the bridges, protesters left Marion Street Bridge and returned to the Capitol Mall area. (Warren Decl., Ex. 6, pp. 11-12) (Moore Decl., Ex. 1, p. 7). At the Capitol Mall, plaintiff and other protesters laid down in the street at night, again blocking vehicular traffic. (Warren Decl., Ex. 6, p. 13) ("We all just kind of laid down in the street." Q. "And were you blocking traffic?" A. "I'm sure, yeah.").

*Protest Turns Violent and Unlawful Assembly Declared*

Around 9:30 p.m., the group again left the Capitol Mall area and began walking back toward the bridges, west on Center Street, "shutting down traffic and [appearing] to have the intent of blocking the bridge traffic." (Moore Decl., Ex. 1, p. 7). "Deputy Chief Miller was informed that this group of protesters appeared to be more agitated and hostile than the original group of protesters from the previous night. Additionally, [SPD officers] were informed that members of the group were handing out gas masks to others in the group." (Moore Decl., Ex. 1, p. 7). There were hundreds of protesters present. (Warren Decl., Ex. 1, p. 7) (Moore Decl., Ex. 1, p. 7). At 9:45 p.m., a large group of protesters with items in their hands began rushing patrol vehicles and blocking traffic at Center Street and Winter Street. (Coduti Decl., Ex. 1, audio at 5:43-6:00; Ex. 2, p. 3). Officers were forced to abandon this location. *Id.* An officer warned over the radio that the "lead element" was "the more aggressive" of the crowd. (Coduti Decl., Ex. 1,

audio at 6:48-6:56). Plaintiff marched within the lead element of the crowd, wearing a bright red sweatshirt with a white stripe and a black face mask. (Warren Decl., Ex. 6, p. 16) (Q. "Where were you in terms of the front of the protester line in relationship to the police?" A. "I [plaintiff] would say I was pretty close to the front, if not the very front." Q. "And why were you there?" A. "That's just where we had been walking ...").

Lt. Jason Van Meter was the Emergency Group Commander, responsible for law enforcement decisions related to crowd control during the May 31, 2020 protest.[2] (Van Meter Decl., ¶ 3). He ordered officers to line up on Liberty Street NE, perpendicular to Center Street NE, to prevent the protesters from reoccupying a bridge. (Van Meter Decl., ¶ 8, Ex. 2, map). He chose this location "[s]o the crowd would have a means of retrograde because they had streets behind them." (Warren Decl., Ex. 3, p. 8) (Van Meter Decl. ¶ 8). Allowing such free movement is tactically problematic but "in order to allow the crowd a place to go, [Lt. Van Meter] accepted that risk." (Warren Decl., Ex. 3, p. 8).

Lt. Van Meter ordered the Salem Police Department's BearCat vehicle to be staged in the middle of the line of officers. (Van Meter Decl., ¶ 9). The BearCat is an armored personnel carrier "that is smaller than most armored vehicles. It's more maneuverable for city-type work, and it's equipped with sound systems and lighting systems to help manage a crowd." (Warren Decl., Ex. 3, p. 4). Salem Police Department's BearCat is equipped with a Long-Range Acoustic Device ("LRAD") enabling the police department to broadcast audible notifications and warnings for long distances. (Van Meter Decl., ¶ 9). Defendant Officer Robert Johnston was positioned to the left of the BearCat, on the north side of Center Street NE. (Johnston Decl., ¶ 4).

---

[2] Lt. Van Meter has extensive training on crowd control methods in dynamic situations. (Van Meter Decl., ¶ 2). In 2016, Lt. Van Meter attended the Basic Civil Disturbance School and became an instructor for the school in 2017. *Id.*

Officer Johnston operated as *one of three* grenadiers that evening and carried several less-lethal munitions on his person.[3] (Johnston Decl., ¶¶ 4-5) (He carried blunt impact projectile rounds ("BIP round"), Stinger rounds, and gas rounds.). A "grenadier" is a trained member of the MRT and responsible for deploying less-lethal munitions. (Johnston Decl., ¶ 4).

At approximately 9:52 p.m., after observing the crowd and threat to public safety, Lt. Van Meter declared the assembly unlawful, pursuant to ORS 131.675 and the City's Emergency Order and instructed an "order to disperse" be given.[4][5] (Van Meter Decl., ¶ 12). At 9:52 p.m., Sgt. Garland began broadcasting repetitious warnings to the protesters that the assembly was unlawful. (Coduti Decl., Ex. 2, p. 3) (Garland Decl. ¶ 4); (Van Meter Decl., ¶ 11); (Adams Decl. Ex. 1, video). As heard in Officer Adams' video recording, Sgt. Garland's repeated warnings and instructions included, "Turn around and walk away"; "This is the Salem Police Department"; "This is an unlawful assembly"; "Leave now"; "Turn around and leave"; "Go home." (Adams Decl., Ex. 1 at 01:40-02:00).

At that time, the crowd began launching projectiles at officers. (Coduti Decl., Ex. 1 at 1:08:26 – 1:08:35, Ex. 2) ("We need hard hats, they're throwing projectiles"). "At around 2155

---

[3] Officer Johnston has been trained on crowd control methods in dynamic situations. (Johnston Decl., ¶ 2). He also has received extensive training in the proper and lawful use of less-lethal munitions. *Id.* at ¶ 4.

[4] Lt. Van Meter was unaware the City's curfew had been lifted by the City Manager previously that day, but the curfew was irrelevant to his decision to declare the protest unlawful at 9:52 p.m. (Warren Decl., Ex. 4, p. 9).

[5] ORS 131.675 was amended on June 11, 2021 by HB 3059 to now read: "131.675. When any five or more persons, are unlawfully assembled in any county, city, town or village, the sheriff of the county and the deputies of the sheriff, the mayor of the city, town or village, or chief executive officer or officers thereof, may go among the person assembled, or as near to them as they can with safety, and command them in the name of the State of Oregon to disperse. If, so commanded, they do not immediately disperse, the officer may arrest them or cause them to be arrested for any unlawful activity constituting an offense."

hours projectiles, specifically mortar fireworks and other improvised explosive devices were thrown at Salem Police Officers." (Moore Decl., Ex. 1, p. 7). An explosion and breaking glass can be heard on Officer Adams' GoPro video after Sgt. Garland had ordered protesters to go home. (Adams Decl., Ex. 1, Video 01:40-02:00). Plaintiff was near the front of the group and heard the announcements. (Warren Decl., Ex. 6, p. 18). Plaintiff testified that "People on the outsides of the crowd started throwing water bottles, <u>but before this it was very peaceful</u>." (*Id.* at pp. 27-28) (emphasis added) (plaintiff concedes prior to her injury the protest was no longer peaceful).

As orders to disperse continued, police officers were assaulted with a variety of dangerous projectiles including rocks, bricks, lit fireworks, glass bottles, full plastic water bottles, and water bottles with nails inside of them. (Warren Decl., Ex. 6, pp. 14, 15-16; Ex. 4, p. 6); (Van Meter Decl., ¶ 11); (Buker Decl., ¶ 3); (Johnston Decl., ¶ 5, Ex. 2, p. 1); (Foster Decl., ¶ 4); (Salazar Decl., ¶ 5); (Schofield Decl., ¶ 3); (Hodges Decl., ¶ 4); (Kirksey Decl., ¶ 4); (Smith Decl., ¶¶ 4-5); (Ferrill Decl., ¶ 6); (Adams Decl. ¶ 5, Ex. 1); (Morrison Decl. ¶ 4); (Keniston Decl. ¶ 7). One firework thrown from the crowd exploded near Officer Ferrill, causing sparks to enter through the back of his pant leg. (Ferrill Decl., ¶ 6). Officer Hodges suffered ringing in his ears for 12 hours after an explosive device thrown by the crowd detonated near him. (Hodges Decl., ¶ 4). Officer Smith was struck by a baseball-sized rock on his foot, causing bruising and soreness. (Smith Decl., ¶ 5, Ex. 1, p. 2).

Despite repeated orders to disperse, plaintiff and many other protesters congregated in the middle of Center Street NE, facing police and only one and a half blocks away from the Center Street bridge. (Adams Decl., Ex. 1).

<u>*Less-Lethal Munitions Authorized To Disperse The Crowd*</u>

Lt. Van Meter authorized the use of less-lethal munitions after a large portion of the crowd defied orders and some assaulted police officers. (Van Meter Decl., ¶ 12, Ex. 3) ("At 21:58 I authorized a gas deployment due to the riot now occurring."); (Moore Decl., Ex. 1, p. 8) ("At 2158 hours, Lt. Van Meter authorized the use of CS gas and other munitions on the unlawful protesters and those launching items at the officers."). Less-lethal munitions were authorized "because officers were under attack from fireworks, projectiles, bricks, water bottles, [and] rocks," not simply to protect property. (Warren Decl., Ex. 2, p. 6). "The authorization to use CS gas also includes the authorization to use all other less-lethal munitions." (Johnston Decl., ¶ 6).

As seen in a Salem News Journal video, an unidentified MRT member fired a Stinger round at the ground in front of protesters standing on the *north* side of Center Street NE. (Warren Decl., Ex. 8 at 03:27, Salem News Journal video). Shortly thereafter, Officer Johnston can be seen hand-tossing CS gas along the ground toward the crowd. (Johnston Decl., ¶ 8, Ex. 2, p. 2); (Adams Decl., Ex. 1 at 02:08); (Warren Decl., Ex. 8 at 03:39). An unidentified protester in the crowd picked up the canister and threw it back at law enforcement officers. (Johnston Decl. ¶ 18) (Adams Decl., Ex. 1 at 02:12). Over the course of the evening, Officer Johnston "launched multiple Stinger rounds which are an indirect skip round <u>"which are aimed at the ground and bounce up</u> to strike the crowd in the shins with small rubber balls." (Johnston Decl., ¶ 9, Ex. 2, p. 2) (emphasis added). At no time that evening did Officer Johnston deploy Stinger rounds above the ground. (Johnston Decl., ¶ 9) ("At no time on May 31, 2020, or at any other time, have I intentionally or negligently deployed this munition by aiming it directly at an individual, or used

it to strike any specific individual. I launched Stinger rounds only at the ground on the night plaintiff was injured.")

SPD MRT "intended to push the protesters east onto Liberty St." (Morrison Decl., Ex. 1, p. 1); (Adams Decl., Ex. 2, p. 2) ("At this point with projectiles being thrown and the crowd refusing to disperse, CS gas had been authorized and deployed. The gas had a desired effect and the crowd started to travel eastbound on Center St."); (Smith Decl., Ex. 1, p. 2) ("Some of the crowd went south down High but the main group went east on Center …); (Keniston Decl., Ex. 1, p. 2) ("As grenadiers deployed CS gas, I could see several crowd members moving to the east."). At one point, plaintiff was struck by some object but is certain "[i]t didn't come from below." (Warren Decl., Ex. 6, p. 21).

### *Stinger Rounds*

As a grenadier, Officer Johnston had access that evening to BIP rounds, Stinger rounds, and CS gas canisters. (Warren Decl., Ex. 4, pp. 4, 8, Johnston Depo.). During the protest, he hand-tossed a CS gas canister and launched Stinger rounds from a 40-millimeter launcher on the ground, toward the crowd. (Johnston Decl., ¶¶ 9-10) ("I did not deploy BIP rounds on May 31, 2020.").

> The Stinger® 40 mm 60-Caliber Round is most widely used as a crowd management tool by Law Enforcement and Corrections. The round contains approximately eighteen 60-Caliber rubber balls. … It is suitable for administering a means of pain compliance over a greater distance than its 32-Caliber Stinger® counterpart. Used for routing crowds or groups that are mildly resistive.

(Johnston Decl., ¶ 9, Ex. 1, p. 2) (emphasis added). Essentially, Stinger rounds are a form of pain compliance, used for routing crowds that are actively resistive. Officer Johnston chose to deploy Stinger rounds, not BIP rounds, because his objective was to *route the crowd*, not to gain any specific individual's compliance. (Warren Decl., Ex. 4, p. 5) (Q. "why [did you] choose a stinger

round versus a BIP round or gas round?" A. "…if I have one antagonist, I would use the BIP round because I have one single person that I need to deal with. I would use the skip [Stinger] rounds if there … was a group … many people to try to deter from actions…."); (Johnston Decl., ¶ 10). To gain an individual's compliance, officers typically deploy a blunt impact projectile ("BIP"; aka "baton" round). (Warren Decl., Ex. 4, p. 3) (Johnston Decl., ¶ 10). The BIP is "most commonly used by tactical teams in situations where greater accuracy and deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject." (Johnston Decl., Ex. 1, p. 3).

*Plaintiff Struck By Projectile Thrown From Crowd*

Plaintiff documented her memory of being struck by a projectile four days after the protest:

> "I [plaintiff] remember turning around to leave but I can't find [my sister]. And in the moment that's when I said, oh, no, where's [my sister], is when something hit me in the eye and it just went black."

(Warren Decl., Ex. 6, p. 28) (emphasis added). Plaintiff is not "fully sure what hit [her], but [thinks] it was a rubber bullet. [She] just doesn't know though." (*Id.* at p. 29). Sgt. Morrison saw plaintiff "get hit in the head with an object [thrown] from the crowd." (Morrison Decl., ¶ 5) (emphasis added). He documented this incident in his official Incident Report on June 5, 2020 – within a few days of the riot and well before plaintiff filed this lawsuit in August 2020. (Morrison Decl., Ex. 1; DKT No. 1).

> As Salem MRT and SWAT began their push forward [east] I witnessed a female [plaintiff] come forward and get hit in the head with an object from the crowd. The female fell to the ground and crawled to the south side walk and near a tree on Center St.

*Id.* (emphasis added). Officer Adams' Go Pro video shows the events surrounding plaintiff's injury but is not clear enough to distinguish the specific object that struck plaintiff. (Adams

Decl., Ex. 1). The video is presented for the court to view and shows the following sequence of events:

| Time | Activity |
|------|----------|
| 02:00 | Use of Munitions Authorized ("Gas! Gas! Gas!" warning) |
| 02:08 | CS gas canister seen rolling on ground into the crowd |
| 02:12 | Unidentified protester throws CS gas canister back at officers |
| 02:12 | Plaintiff turns to leave and continues walking away from the line of officers |
| | Plaintiff testifies she was struck *after* she turned around to leave. (Warren Decl., Ex. 6, p. 28) ("I remember turning around to leave but I can't find [my sister]. And in the moment that's when I said, oh, no, where's [my sister], is when something hit me in the [right] eye and it just went black." |
| 02:14 | Projectile thrown from crowd toward officers |
| 02:14 – 02:23 | Plaintiff continues walking within the crowd, with her back toward officers |
| 02:23 | Plaintiff begins walking toward the sidewalk, away from the crowd |
| 02:24 | Multiple projectiles thrown from crowd toward officers |
| 02:25 | Plaintiff bends down on the street and moves to the sidewalk |
| 02:26 | Projectile thrown from crowd toward officers as plaintiff falls near sidewalk |
| 02:35 | SPD officer responds to assist plaintiff, 11 seconds after she fell down |

Plaintiff did not see any rubber balls or hear of anyone else who saw rubber balls before, during, or after this incident. (Warren Decl., Ex. 6, pp. 19-20). Plaintiff did, however, witness "people unrelated to the peaceful march [come] in from side streets, and from behind the march throwing objects into the crowd." (FAC, ¶ 18) (emphasis added); (Warren Decl., Ex. 6, p. 25). Plaintiff stood at the front of the line, *between* violent protesters and police. Sgt. Morrison is the *only* witness to the event and saw plaintiff get "hit in the head with an object from the crowd," not a rubber ball or bullet as plaintiff has alleged. (Morrison Decl., ¶ 5, Ex. 1).

Further, plaintiff did not witness *any* other protesters being struck with rubber balls or bullets prior to her injury. (Warren Decl., Ex. 6, pp. 19-20, 29). Officer Adams' video does not show any protester being hit or injured from any direction. (Adams Decl., Ex. 1). SPD did not receive any reports of injuries from less-lethal munitions for the events of May 31, 2020, other than plaintiff. (Moore Decl., Ex. 1).

*Immediate Medical Care*

As shown above, SPD immediately responded to plaintiff's medical needs. Less than four minutes passed between plaintiff's injury and medics' arrival to aid her. (Coduti Decl., Ex. 2, p. 3). (Van Meter Decl., Ex. 3, p. 1) ("Plaintiff was immediately provided medical care and transported to the Salem Hospital for further treatment."); (Keniston Decl., Ex. 1, p. 2) ("…I heard officers via radio ask for a 'code three medic' for a female with an eye injury. As officers stayed with the female waiting for medics, other MRT personnel moved forward until the crowd had cleared the roadway.")

Defendant Officer Kevin Ramirez was assigned to work in a supportive role at the protest on May 31, 2020 and was positioned about a block behind the line of officers on Liberty Street. (Warren Decl., Ex. 5, pp. 3, 5, Ramirez Depo.). He "heard over the radio that they were calling for a medic to come to the scene because of an injured female." (*Id.* at p. 7). Officer Ramirez left his position behind the MRT to aid plaintiff until medics arrived. *Id.* He saw plaintiff standing on the sidewalk. (*Id.* at p. 8). He introduced himself and "clearly explained that she wasn't in any kind of trouble … and told her that a medic was on the way." (Warren Decl., Ex. 5, p. 21; Ex. 6, p. 23) ("I [plaintiff] remember standing with my hands up, and him [Officer Ramirez] saying, 'It's fine.' Like, 'You can put your hands down.' And I just couldn't because I was so emotional."). It took three or four minutes for medics to arrive. (Warren Decl., Ex. 5, p. 10)

(Coduti Decl., Ex. 2, p. 3). Officer Ramirez told medics that plaintiff was complaining of an eye injury and walked with plaintiff to the ambulance. (Warren Decl., Ex. 5, p. 11; Ex. 6, p. 24) ("…I remember the EMT in the hat asked me to come in the ambulance." Q. "And did you go with him?" A. "I did.").

After plaintiff's injury, protesters remained energized and at one point surrounded an occupied vehicle driving on Court Street and started jumping on the hood of the car. (Moore Decl., Ex. 1, p. 8). When protesters surrounded the vehicle, MRT and other officers moved in to effect a vehicle rescue. *Id.* As the protesters saw police vehicles and MRT move into the area, they began to disperse in multiple directions. *Id.* It was after the vehicle rescue that the majority of arrests were made. *Id.* Plaintiff was not arrested or charged with any crimes on May 31, 2020 and crowd management operations ended at approximately 1:06 a.m. on June 1, 2020. (FAC; Moore Decl., Ex. 1, p. 8).

When later critiquing the events on May 31, 2020, Chief Moore noted that "Deputy Chief Miller chose not to deploy MRT to peaceful protests due to concerns that police presence at that time may have inflamed the situation"; however, the "delayed deployment of our MRT, in hindsight, may have been the wrong decision as it allowed more time for people to engage in unlawful activity." (Moore Decl., Ex. 1, p. 8).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex*, 477 U.S. at 323. The non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

"A Summary Judgment Motion cannot be defeated by relying solely upon conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). It is only the material facts that come into play. A fact is "material" when it is relevant to an element of a claim or when its existence might affect the outcome of the suit. *TW Elec. Service Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). If the non-moving party's facts, together with undisputed background or contextual facts, do not show the non-moving party to be justified to a jury verdict in its favor, summary judgment is appropriate. *Id.* at 631. Summary judgment is mandated where the facts and the law will reasonably support only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). One of the principal purposes of a summary judgment procedure is to isolate the disposal of claims that are not factually supported and the rule is to be interpreted to accomplish this purpose. *Celotex*, 477 U.S. at 323-24. The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson*, 477 U.S. at 252. Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## ARGUMENTS

### FEDERAL CLAIMS

I.    **§1983 Claim – First Amendment**

    A.  **Plaintiff Was Not Engaged In A Constitutionally Protected Activity At The Time Of Her Injury**

Plaintiff's first claim alleges defendants deprived her of her First Amendment rights when "she was shot for her speech and peaceful assembly" and when "SPD Officers detained her and would not let her leave, and the SPD medic denied her medical care or assistance." (FAC, ¶¶ 46-47).

To prevail on her First Amendment retaliation claim, plaintiff must prove:

1. she was engaged in a constitutionally protected activity,

2. defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, *and*

3. the protected activity was a substantial or motivating factor in the defendants' conduct

*O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). Plaintiff must also establish a causal connection between the defendants' retaliatory animus and her injury. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). To establish causation, plaintiff must prove "that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 139 S. Ct. at 1725.

As a threshold matter, plaintiff was *not* engaged in a constitutionally protected activity after protesters threatened public safety and the protest was declared unlawful. The United States Supreme Court has held, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S. Ct. 2559, 2564 (1981). "[R]easonable 'time, place and manner' regulations may be necessary to further significant governmental interests, and are permitted." *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S. Ct. 2294, 2303 (1972). "[P]eaceful demonstrations in public places are protected by the First Amendment"; however, "where demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned*, 408 U.S. at 116 (emphasis added). Further,

the Ninth Circuit recognizes cities maintain an essential interest in maintaining civic order during protests and the constitutional rights of non-violent protesters can be constitutionally limited by a subset of violent protesters.

> In balancing desired freedom of expression and the need for civic order, to accommodate both of these essential values, <u>a measure of discretion necessarily must be permitted to a city, on the scene with direct knowledge, to fashion remedies to restore order once lost. It may be that a violent subset of protesters who disrupt civic order will by their actions impair the scope and manner of how law-abiding protesters are able to present their views.</u>

*Menotti v. City of Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005) (emphasis added).

Here, the evidence shows defendants allowed the May 31, 2020 demonstration to continue for hours, throughout downtown Salem, *until* plaintiff and other protesters initially blocked the Marion Street Bridge and then later turned violent. As explained above, the protesters' act in occupying the bridge created an actual and imminent threat to public safety, requiring the SPD's Mobile Response Team ("MRT") to activate. (Moore Decl., Ex. 1, p. 7). Members of the SPD MRT were deployed to "[p]rotect critical infrastructure, specifically the bridge." (Warren Decl., Ex. 3, p. 4).

Around 9:45 p.m., a large group of protesters marching from the Capitol toward the Center and Marion Street Bridges with items in their hands began rushing patrol vehicles and blocking traffic at Center Street and Winter Street. (Morrison Decl., Ex. 16, p. 1); (Coduti Decl., Ex. 1 at 1:03:08 – 1:03:23). Officers were forced to abandon this location. *Id.* An officer warned over the radio that the "lead element" was "the more aggressive" of the crowd. (*Id.* at 1:04:13 – 1:04:21). As plaintiff concedes in her First Amended Complaint, "[a]fter nightfall, people unrelated to the peaceful march came in from side streets, and from behind the march throwing objects into the crowd." (FAC, ¶ 18). As the Ninth Circuit held, "[i]t may be that a violent subset of protesters who disrupt civic order will by their actions impair the scope and manner of how

law-abiding protesters are able to present their views." *Menotti v. City of Seattle*, 409 F.3d at 1155.

Protesters continued approaching the bridge, blocking vehicular traffic, so at approximately 9:52 p.m., Lt. Van Meter "declared the assembly unlawful and instructed that the order to disperse be given." (Van Meter Decl., ¶¶ 13, 25). By 9:55 p.m., Sgt. Garland began broadcasting repeated warnings to protesters that an unlawful assembly had been declared. (Garland Decl. ¶ 4); (Van Meter Decl., ¶ 11); (Adams Decl. Ex. 1, video). Plaintiff heard the announcements. (Warren Decl., Ex. 6, p. 18). As heard in Officer Adams' video recording, Sgt. Garland's warnings and instructions included, "Turn around and walk away"; "This is the Salem Police Department"; "This is an unlawful assembly"; "Leave now"; "Turn around and leave"; "Go home." (Adams Decl., Ex. 1 at 01:12-02:00). Despite repeated orders to disperse, plaintiff and many other protesters congregated in the middle of Center Street NE, facing police. *Id.* At that time, the crowd grew more aggressive and began launching projectiles at officers. (Coduti Decl., Ex. 1 at 1:08:26 – 1:08:35, Ex. 2) ("We need hard hats, they're throwing projectiles"). As orders to disperse began around 9:55 p.m., the crowd stopped and began launching "projectiles, specifically mortar fireworks, and one homemade explosive device" in addition to "water bottles, rocks, and bricks." (Van Meter Decl., Ex. 3). An explosion and breaking glass can be heard on Officer Adams' video *after* Sgt. Garland orders protesters to go home and *before* any force was used by SPD. (Adams Decl., Ex. 1 at 01:40-02:00). Lt. Van Meter authorized the use of less-lethal munitions *after* the crowd ignored the orders and assaulted police officers with projectiles. (Lt. Van Meter Decl., ¶ 12, Ex. 3) (At 9:58 p.m., "I authorized a gas deployment due to the riot now occurring.").

Plaintiff was injured *after* SPD declared an unlawful protest and authorized less-lethal munitions. Consequently, when plaintiff was injured, she was no longer engaged in a lawful protest because "where demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned*, 408 U.S. at 116. Defendants lawfully restricted the time, place and manner of the May 31, 2020 protest *after* protesters threatened public safety by occupying vital infrastructure and threatened officer safety by launching various items at them. Plaintiff's First Amendment claim should be dismissed because plaintiff was *not* engaged in constitutionally protected activity at the time of her injury.

### B. Motivating Factor was Unlawful Activity, Not Lawful Protest

As detailed above, the City allowed protests to continue on May 31, 2020, for hours and across many City blocks. Protesters occupied vital infrastructure, but SPD allowed the protest to continue because protesters voluntarily returned to the Capitol Mall area. No curfew was enforced against protesters as it had been the previous and subsequent nights. The protest was not declared unlawful *until* protesters marched back toward the bridges, blocking vehicular traffic and rushing a police vehicle on their way. The single motivating factor here was public safety. No reasonable juror could find otherwise.

When critiquing the events on May 31, 2020, Chief Moore noted that "Deputy Chief Miller chose not to deploy MRT to peaceful protests due to concerns that police presence at that time may have inflamed the situation"; however, the "delayed deployment of our MRT, in hind-sight, may have been the wrong decision as it allowed more time for people to engage in unlawful activity." (Moore Decl., Ex. 1, p. 8). What was once a lawful protest and proper First Amendment activity had morphed into unlawful conduct that presented a threat to officers and others.

As examined below, even *if* plaintiff was engaged in a lawful protest at the time of her injury, the undisputed evidence shows it was no longer a peaceful protest when plaintiff was "hit in the head with an object from the crowd," not by any defendant. (Morrison Decl., ¶ 5, Ex. 1).

## II.      §1983 Claim – Fourth Amendment

Plaintiff's second claim alleges she "was seized by Defendants Powers, Moore, Ramirez, and Johnston when Defendants intentionally through the use of physical force, shooting, and chemical agents prevented her freedom of movement." (FAC, p. 13, ¶ 53). Specifically, plaintiff alleges "Officer Johnston intentionally shot 'Stinger' rounds or 'skip' rounds (rubber projectiles) from his City of Salem Police Department issued 40mm Launcher at Black demonstrators using deadly force in violation of SPD Policy." *Id.* at ¶ 53.

Claims of unlawful seizure through use of excessive force are analyzed under the Fourth Amendment's "reasonableness" standard, using the Supreme Court's framework set forth in *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989). The objective reasonableness standard balances: (1) "the nature and quality of the intrusion on an individual's Fourth Amendment interests," against (2) "the countervailing governmental interests at stake." *Id.*

> "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See *Tennessee v. Garner,* 471 U.S., at 8–9, 105 S.Ct., at 1699–1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure [or force]").

*Id.* "[T]he most important single element of the three specified factors [is] whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (emphasis added).

The Supreme Court explained that "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Cantwell v. State of Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900, 905 (1940). It is only unreasonable seizures that can be found to violate the Fourth Amendment.

### A. Officer Johnston Did Not Seize Plaintiff

The Ninth Circuit held a Fourth Amendment "seizure" occurs when an officer's intentional conduct aimed toward an individual or group causes physical force on an individual and terminates their movement. *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012). Plaintiff alleges defendants Power, Moore, Ramirez, and Johnston seized her by physical force. (FAC, p. 13). Again, a seizure results in a constitutional violation *only* if it is unreasonable. *Graham,* 490 U.S. 386.

Plaintiff alleges, "SPD Officer Johnston intentionally shot 'Stinger' rounds or 'skip' rounds (rubber projectiles) from his City of Salem Police Department issued 40mm Launcher at Black demonstrators using deadly force in violation of SPD Policy." (FAC, ¶ 23). As explained above, the undisputed evidence shows plaintiff was struck in the head by a projectile thrown at police by another protester. Four days after the event, plaintiff documented the incident in her words:

> "I remember turning around to leave but I can't find Sy [sister]. And in the moment that's when I said, oh, no, where's Sy, is when something hit me in the [right] eye and it just went black."

(Warren Decl., Ex. 6, p. 28). Plaintiff did not see any rubber balls or hear of anyone else who saw rubber balls before, during, or after this incident. (*Id.* at pp. 19-20). Furthermore, plaintiff knows the object that hit her did <u>not</u> come from below. (*Id.* at p. 21). Her treating doctor was

deposed and testified he saw an eye injury and abrasion on the lower lid of her right eye and would be unable to rule in or out any object for what could have hit her. (Warren Decl., Ex. 7, p. 9, Dr. Westfall Depo.). The Stringer rounds deployed by Officer Johnston over the course of the evening were aimed at the ground and <u>bounced</u> from the ground directed at an area below the knee. (Johnston Decl., ¶ 9). At no time on May 31, 2020, did Officer Johnston launch munitions above the ground or directly at the bodies of protesters. *Id*.

Plaintiff was standing at the front of the line apparently *between* what she acknowledges were violent protesters and the police. Plaintiff witnessed "people unrelated to the peaceful march [come] in from side streets, and from behind the march <u>throwing objects into the crowd</u>." (FAC, ¶ 18) (emphasis added); (Warren Decl., Ex. 6, p. 25). Sgt. Morrison is the *only* witness who saw what actually hit plaintiff and documented she got "hit in the head with an object from the crowd," not a rubber ball. ((Morrison Decl., ¶ 5, Ex. 1). "I witnessed [plaintiff] … get hit in the head with an object from the crowd." *Id.* (emphasis added). Sgt. Morrison's report establishes that Officer Johnston nor any other SPD activity caused plaintiff's injury.

Plaintiff admitted, four days after her injury, "I'm not fully sure what hit me, [I] think it was a rubber bullet. [I] just don't know, though." (Warren Decl., Ex. 6, p. 29). Plaintiff's lack of knowledge does not create a material dispute of fact. *See Fed. Election Comm'n. v. Toledano, 317 F.3d 939, 950 (9th Cir. 2002), as amended on denial of reh'g* (Jan. 30, 2003) ("failure to remember and lack of knowledge are not sufficient to create a genuine dispute. The district court [is] entitled to treat these facts as established for purposes of summary judgment."). Furthermore, plaintiff saw a retina specialist on June 3, 2020, who cannot testify that plaintiff was hit by a rubber ball. (Warren Decl., Ex. 7, p. 9) (Q. "…are you able to rule in or out any object that would have caused this [injury]?" A. "I would just probably say the – not – no.").

No genuine dispute of fact exists that plaintiff was hit by an object thrown from the crowd; therefore, she was not seized by Officer Johnston and this claim should be dismissed.

**B. Officer Johnston's Use Of Force Was Reasonable**

Even if plaintiff could establish that some Stinger round was the cause of her injury, the injury was unintentional and the force used was reasonable. The objective reasonableness standard in *Graham* balances: (1) "the nature and quality of the intrusion on an individual's Fourth Amendment interests," against (2) "the countervailing governmental interests at stake." 490 U.S. at 396.

1. *Nature and Quality of Intrusion –Intermediate Force Deployed Against Crowd*

Officer Johnston did not use deadly force or target black protesters. (Johnston Decl., ¶ 10) ("It would not have been possible to target non-white protesters, wearing masks, in the dark with CS gas or Stinger rounds."). Officer Johnston deployed "Stinger rounds" to disperse protesters. (*Id.* at ¶ 9). Stinger rounds (exploding device with small rubber balls) are a form of pain compliance, not deadly force, used for dispersing crowds that are resistive. *Id.* As described in SPD Directive 5.05, "Flexible impact rounds are classified as kinetic energy extended-range impact weapons. As such, on our force continuum, these rounds will be on the same level as batons and OC spray." (Johnston Decl., Ex. 3, p. 6). The Ninth Circuit classifies this type of force as intermediate. *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) ("Both pepper spray and baton blows are forms of force capable of inflicting significant pain and causing serious injury. As such, both are regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests."). Significant force is justified by a commensurately significant state interest. *Young*, 655 F.3d at 1162-1163.

Cities have a "significant governmental interest in restoring and maintaining civic order to the core downtown area." *Menotti*, 409 F.3d at 1137. Such was the situation on this evening.

2. *Governmental Interest - Significant*

    a. <u>Severity Of Crimes Was Significant, Including Both Felonies and Misdemeanors</u>

In *Nelson v. City of Davis*, a college student "suffered permanent injury when he was shot in the eye by a pepperball projectile fired from the weapon of a U.C. Davis officer when U.C. Davis and City of Davis police attempted to clear an apartment complex of partying students." *Nelson v. City of Davis*, 685 F.3d 867, 872 (9th Cir. 2012). When analyzing the severity of crimes there, the Court considered whether the college student and his friends [the group Nelson stood within] committed any crimes. *Id.* at 879 (emphasis added) ("The police did not contend that Nelson or any of his companions were committing a crime at the time that he was shot."). Likewise, here, the Court should consider whether plaintiff, or the group she stood within, committed any crimes when ordered to disperse from an unlawful assembly.

This case is easily distinguished from *Nelson* because here, at the time officers began to advance, they had probable cause to arrest plaintiff (and others) for at least two misdemeanors including Disorderly Conduct and Criminal Trespass in the Second Degree.[6] Furthermore, defendants had probable cause to arrest individuals within plaintiff's group for Assault (felony) against public safety officers, and Rioting (felony). Although plaintiff was not arrested, SPD "made 14 arrests for trespass, rioting, and disorderly conduct" during the May 31, 2020 protest. (Moore Decl., Ex. 1, p. 8). As explained above, plaintiff had earlier participated in occupying the

---

[6] Assaulting a public safety officer (ORS 163.208) (Class C felony); Rioting (ORS 166.015) (Class C felony); Disorderly Conduct in the second degree (ORS 166.025) (Class B misdemeanor); Criminal Trespass in the second degree (ORS 164.245) (Class C misdemeanor); Interfering with public transportation (ORS 166.116) (Class C misdemeanor).

bridge, which created a significant public safety hazard. Accordingly, this first *Graham* factor weighs in favor of defendants.

> b. Plaintiff and the crowd around her posed an immediate threat to the safety of the officers and others

"[T]he most important single element of the three specified [*Graham*] factors [is] whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (emphasis added). In *Nelson*, the Ninth Circuit "consider[ed] the degree of threat posed by Nelson and his friends…," not just Nelson. *Id.* at 881.

Here, plaintiff and the other protesters posed an immediate threat to the safety of officers and others. As examined extensively above, the protesters threatened public safety by completely occupying the Marion Street Bridge, preventing vehicular traffic and emergency vehicles from entering into West Salem. (Van Meter Decl., ¶ 5). Plaintiff participated in the unlawful occupation of the Marion Street Bridge. (Warren Decl., Ex. 6, p. 9) ("we all stopped at the top [of the bridge]"). The protesters' act in occupying the bridge created an actual and imminent threat to public safety, requiring activations of the MRT. (Moore Decl., Ex. 1, p. 7). Moreover, after orders to disperse were given, protesters threw projectiles at officers *before* officers had even used any force. (Coduti Decl., Ex. 2, p. 3). As orders to disperse began around 9:55 p.m., the crowd stopped and began launching "projectiles, specifically mortar fireworks, and one homemade explosive device" in addition to "water bottles, rocks, and bricks." (Van Meter Decl., Ex. 3). An explosion and breaking glass can be heard on Officer Adams' video after Sgt. Garland ordered protesters to go home - before CS gas was first deployed. (Adams Decl., Ex. 1, Video 01:40-02:00).

The degree of threat posed by plaintiff and other protesters weighs strongly in favor of the level of force response employed here.

c.  Plaintiff and the crowd around her failed to comply with lawful orders to disperse

"Even passive resistance may support the use of some degree of governmental force if necessary to attain compliance, however the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Nelson*, 685 F.3d at 881 (citation and internal quotation marks omitted). In *Nelson*, like here, officers did not attempt to place plaintiff under arrest, so the Court "considered only whether the degree of force employed may be justified by a <u>failure to comply with orders</u> given by the officers." *Id.* (emphasis added).

Plaintiff failed to comply with orders to turn around and go home before CS gas was deployed. At 9:55 p.m., Sgt. Garland began broadcasting repetitive warnings from the LRAD to the protesters that an unlawful assembly had been declared. (Garland Decl. ¶ 4); (Van Meter Decl., ¶ 11); (Adams Decl. Ex. 1, video). "The LRAD is an important piece of equipment in crowd management situations [because it] can be clearly heard over large crowds, background noise and over long distances." (Moore Decl., Ex. 1, p. 7). As heard in Officer Adams' video recording, Sgt. Garland's warnings and instructions included, "Turn around and walk away"; "This is the Salem Police Department"; "This is an unlawful assembly"; "Leave now"; "Turn around and leave"; "Go home." (Adams Decl., Ex. 1 at 01:40-02:00). At that time, some in the crowd began launching projectiles at officers. (Coduti Decl., Ex. 1 at 1:08:26 – 1:08:35, Ex. 2) (We need hard hats, they're throwing projectiles).

Plaintiff was near the front of the group and heard the announcements. (Warren Decl., Ex. 6, p. 18). The crowd was not too large to comply with orders. (Morrison Decl., Ex. 1, p. 2) (protesters dispersed "in an easterly direction."); (Smith Decl., Ex. 1, p. 2) ("Some of the crowd went south down High but the main group went east on Center …). In fact, Lt. Van Meter chose

the location "[s]o the crowd would have a means of retrograde because they had streets behind them." (Warren Decl., Ex. 3, p. 8).

In *Nelson*, the Ninth Circuit held that "failure to comply with the full extent of an officer's orders" alone is not enough to justify various applications of force. *Nelson*, 685 F.3d at 882. The Court also noted: "Active resistance" requires attempts to "threaten the officers or place them at risk…." *Id.* Here, many protesters failed to comply with officers' orders and actively resisted by assaulting police officers with a variety of dangerous projectiles including rocks, bricks, lit fireworks, glass bottles, full plastic water bottles, and water bottles with nails inside of them. (Warren Decl., Ex. 6, pp. 14, 15-16; Ex. 4, p. 6); (Van Meter Decl., ¶ 11); (Buker Decl., ¶ 3); (Johnston Decl., ¶ 5, Ex. 2, p. 1); (Foster Decl., ¶ 4); (Salazar Decl., ¶ 5); (Schofield Decl., ¶ 3); (Hodges Decl., ¶ 4); (Kirksey Decl., ¶ 4); (Smith Decl., ¶¶ 4-5); (Ferrill Decl., ¶ 6); (Adams Decl. ¶ 5, Ex. 1); (Morrison Decl. ¶ 4); (Keniston Decl. ¶ 7). Plaintiff was standing within the actively resistant group at the time less-lethal munitions were deployed. (Adams Decl., Ex. 1 at 01:40-02:15). Again, the Stinger rounds were deployed that evening were deployed at the ground and not at individual protesters.

For this element, the balance on the City's side recognized cities have a "significant governmental interest in restoring and maintaining civic order to the core downtown area." *Menotti*, 409 F.3d at 1137 (emphasis added). In fact, all the *Graham* factors weigh to the benefit of defendants. Accordingly, Plaintiff's Fourth Amendment excessive force claim fails and should be dismissed.

### C. Officer Ramirez Did Not Seize Plaintiff

As for the claim against Officer Ramirez, who tried to assist plaintiff, she alleges in her First Amended Complaint that she *begged* "Officer Ramirez to allow her to leave and find her

family" but he did "not let her leave." (FAC, ¶ 28). As shown below, the objective evidence and plaintiff's own testimony does not support this bare allegation.

For Fourth Amendment purposes, an officer seizes an individual if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that [she] was not at liberty to ignore the police presence and go about [her] business." *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382 (1991)(emphasis added). "Because warrantless ... seizures are per se unreasonable, the government bears the burden of showing that a warrantless ... seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes,* 703 F.3d 1135, 1141 (9th Cir. 2012) (citation and internal quotation marks omitted). "The Supreme Court recognized that, by necessity, local police officers often must 'engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *United States v. Erickson*, 991 F.2d 529, 531 (9th Cir. 1993) (quoting *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S. Ct. 2528 (1973)). Officers are "expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect community safety." *Erickson*, 991 F.2d at 531 (citation and internal quotation marks omitted). Assisting a person like plaintiff injured in a public place undoubtedly qualifies as one of these community caretaking functions.

"In determining whether a [seizure] is reasonable within the meaning of the Fourth Amendment, the governmental interest motivating the search must be balanced against the intrusion on the individual's Fourth Amendment interests." *Id*. at 531. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which,

taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968).

Here, there was no intrusion upon plaintiff because she was neither restrained nor obstructed, searched, interrogated, or told not to leave. Defendant Officer Ramirez simply assisted plaintiff after she was injured and waited with her until the medics arrived. (Ramirez Decl., ¶ 3). Plaintiff was not even able to explain why Officer Ramirez is a defendant in this case. (Warren Decl., Ex. 6, p. 3) (Q. "But before you went to see a lawyer, you probably had something in mind that some people did something wrong; right?" A. "Yes." Q. "And did you have anything in mind as to what Officer Ramirez did that caused your injury?" A. "I can't say what all transpired that night, so I don't know.").

Plaintiff further testified she knows Officer Ramirez assisted her after she was struck in the eye. He was "trying to ask me [plaintiff] what was going on, where it hurt, stuff like that." (*Id.* at p. 4) Plaintiff did *not* testify that Officer Ramirez told her she could not leave the scene. In fact, plaintiff remembers talking to Officer Ramirez with her hands in the air when Officer Ramirez told her, "It's fine. … You can put your hands down." (*Id.* at p. 23). She kept her hands in the air "because [she] was so emotional." *Id.* No one ever told plaintiff she was under arrest. *Id.*

Officer Ramirez was assigned to work in a supportive role at the demonstration. (Warren Decl., Ex. 5, p. 3). He was instructed to "hang out in the back in case anything was needed." (*Id.* at p. 4). He heard over the radio there was an injured female [plaintiff]. (*Id.* at p. 7). He first encountered plaintiff standing up on the sidewalk. (*Id.* at p. 8-9). He introduced himself, told her she was not in trouble, and that help was on the way. (*Id.* at p. 9). Plaintiff walked with him away from the edge of the sidewalk. *Id.* Plaintiff said something about finding her family but did not

ask to leave. (*Id.* at p. 10). When medics arrived 3-4 minutes later, Officer Ramirez walked with plaintiff to the ambulance and told medics plaintiff was complaining of an eye injury. (*Id.* at pp. 10-11). At no time did plaintiff try to leave the scene. (*Id.* at p. 12). Plaintiff voluntarily entered the ambulance. (Warren Decl., Ex. 6, p. 24).

There is no evidence supporting plaintiff's allegation in her First Amended Complaint that Officer Ramirez would "not let her leave." (FAC, ¶ 47). To the contrary, plaintiff voluntarily remained at the scene and accepted the medical care offered including transport to the hospital. No reasonable juror could find that Officer Ramirez seized plaintiff. Even if plaintiff had been seized, the community caretaking and exigent circumstances exceptions to the Fourth Amendment clearly apply here where Officer Ramirez only rendered aid and was not attempting to investigate or enforce any laws.

## III. Defendants Powers and Moore Cannot Be Held Liable Under A Theory Of Respondeat Superior

The City Manager and retired Chief of Police should be dismissed. "Liability under [§] 1983 arises only upon a showing of personal participation by the defendant. A supervisor is only liable for the constitutional violations of … subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under [§] 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and §1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Accordingly, to prevail against these defendants, plaintiff must establish they individually and personally violated her constitutional rights or approved of such violation. There is no such evidence in this case.

As shown above, plaintiff's First and Fourth Amendment rights were not violated, but even if they were, plaintiff has no facts to prove City Manager Powers or retired Chief Moore personally participated in seizing her or using force against her. (FAC, ¶¶ 6, 8). In fact, neither defendant participated in the events on the night of May 31, 2020. (Moore Decl., ¶ 6) ("I was not present at the protest on May 31, 2020. Rather, I received regular status updates from Deputy Chief Skip Miller."). Accordingly, there is no basis to continue these claims and defendants Powers and Moore must be dismissed.

## IV.    Defendant Officers Are Entitled To Qualified Immunity

Even if launching less-lethal munitions at the ground as a means of crowd control during an unlawful protest and rendering aid to an injured protester were held to be close questions on the force used, Officers Johnston and Ramirez should still be entitled to Qualified Immunity. "Qualified immunity shields a government official from money damages unless (1) the official violated a statutory or constitutional right, and (2) that right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted). The Supreme Court "does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. at 741. Simply put, "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The officers are at a minimum entitled to qualified immunity. No case clearly establishes that deploying less-lethal munitions at the ground toward unlawful protesters after an unlawful

assembly had been declared, is unconstitutional. Further, no case clearly establishes that rendering aid to an injured protester on a public sidewalk is unconstitutional. Reasonable officers confronting the circumstances faced by Officers Johnston and Ramirez on May 31, 2020, could have reasonably believed their use of force and medical aid was lawful under the circumstances. The question is not even close, and the defendant officers are entitled to qualified immunity and plaintiff's First and Fourth Amendment claims against them must be dismissed.

## V.  There is no *Monell* Liability Under These Facts

Plaintiff's third claim is a *Monell* claim against the City. (FAC, ¶¶ 61-71). Generally, a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents as the Supreme Court has rejected *respondeat superior* as a basis of liability under § 1983. As a result, a local government may only be found liable if the entity itself acted in violation of the Constitution. The Supreme Court explained that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dept. of Soc. Services*, 436 U.S. 658, 694 (1978). To impose § 1983 liability against a governmental entity, a plaintiff must rely on one of three theories:

> "**First**, the plaintiff may prove that a city employee committed the alleged constitutional violation <u>pursuant to a formal governmental policy or a longstanding practice or custom</u> which constitutes the standard operating procedure of the local government entity. **Second**, the plaintiff may establish that <u>the individual who committed the constitutional tort was an official with final policy-making authority</u> and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. **Third**, the plaintiff may prove that <u>an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it</u>."

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *cert denied*, 520 U.S. 1117 (1997), *citing*

*Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992), *cert denied*, 510 U.S. 932 (1993)

(emphasis added).

Plaintiff alleges the City's following "policies, customs, or practices … were unconstitutional or caused the violation of Plaintiff's First and Fourth Amendment rights of the U.S. Constitution." (FAC, ¶ 64). There is no evidence to support any of these allegations.

1. The City created a policy to "kettle" demonstrators in an area leaving them no viable exit while ordering them to leave the area. (FAC, ¶ 32).

Plaintiff fails to identify the location of this policy because no such policy exists. (Moore Decl., ¶ 7). Moreover, the evidence shows Lt. Van Meter ordered officers to line up on Liberty Street NE, perpendicular to Center Street NE, to prevent the protesters from reoccupying the bridge. (Warren Decl., Ex. 3, pp. 4, 14, 17). He chose this location "[s]o the crowd would have a means of retrograde because they had streets behind them." (Warren Decl., Ex. 3, p. 8). Allowing such free movement is tactically problematic, but "in order to allow the crowd a place to go, [Lt. Van Meter] accepted that risk." *Id.*

Indeed, protesters retreated exactly as Lt. Van Meter had hoped. (Morrison Decl., Ex. 1, p. 2) (Protesters began to disperse "in an easterly direction"); (Adams Decl., Ex. 2) ("At this point with projectiles being thrown and the crowd refusing to disperse, CS gas was authorized and deployed. The gas had a desired effect and the crowd started to travel eastbound on Center St."); (Smith Decl., Ex. 1, p. 2) ("Some of the crowd went south down High but the main group went east on Center …); (Keniston Decl., Ex. 1, p. 2) ("As grenadiers deployed CS gas, I could see several crowd members moving to the east."). There is no evidence to support liability for the City on this allegation.

2. The City has a policy or practice of providing "unclear and confusing dispersal messages which do not reduce the concentration of persons in the area." (FAC, at ¶ 33).

No such policy, custom or practice exists. (Moore Decl., ¶ 7). Allegations of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality. *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995).

Plaintiff has no facts showing this happened even *once* and certainly does not meet her burden to show it is a policy, custom or practice. In fact, the City used a Long Range Acoustical Device ("LRAD") to make announcements to protesters on May 31, 2020. (Van Meter Decl., ¶ 9). "The LRAD is an important piece of equipment in crowd management situations [because it] can be clearly heard over large crowds, background noise and over long distances." (Moore Decl., Ex. 1, p. 7). There is no evidence the LRAD was not operating correctly on May 31, 2020, or that the City has a policy or practice of using it incorrectly. Video evidence shows the orders were not unclear or confusing. (Adams Decl., Ex. 1 at 01:40-02:00).

Moreover, earlier on May 31, 2020, Sergeant Gill and his team of officers were assigned to communicate personally "with various crowds in order to understand what their intent is, [and] how [SPD] could support their First Amendment rights." (Warren Decl., Ex. 3, pp. 6-7). This allegation fails.

3. The City has a policy or practice of "using random, uncontrolled, and dangerous application of non-lethal technology" and "Defendant Moore failed to adequately train SPD employees to respond to civil disturbances." (FAC, at ¶ 34).

No such policy or practice exists. (Moore Decl., ¶ 7). Proof of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality. *Navarro* at 714.

To prevail on her failure to train claim, plaintiff must also show the following three elements: "(1) an inadequate training program, (2) deliberate indifference on the part of the

[City] in adequately training its law enforcement officers, and (3) whether the inadequate training 'actually caused' a deprivation of [plaintiff's] constitutional rights." *Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989). "[A] municipal defendant can be held liable because of a failure to properly train its employees <u>only</u> if the failure reflects a 'conscious' choice by the government." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016) (emphasis added) ("In other words, the government's omission must amount to a 'policy' of deliberate indifference to constitutional rights.").

Satisfying this standard requires plaintiff prove "that the municipality had 'actual or constructive notice that a particular omission in their training program' will 'cause[ ] [municipal] employees to violate citizens' constitutional rights.'" *Kirkpatrick v. Cty. of Washoe*, 843 F.3d at 794 (citation omitted). To demonstrate the City "was on notice of a constitutionally significant gap in its training, it is 'ordinarily necessary' for a plaintiff to demonstrate a 'pattern of similar constitutional violations by untrained employees.'" *Id.* (citation omitted). Plaintiff has no facts showing this happened even *once* and certainly does not meet her burden to show it is a pattern. "The officers who are authorized to use less lethal munitions for crowd control are well trained." (Moore Decl., ¶ 7).

Plaintiff can identify no facts supporting such a "stringent standard of fault." (*Connick v. Thompson*, 563 U.S. 51, 61 (2011) and this ground also fails.

4. The City has "a custom or policy of using munitions and indiscriminate force without probable cause against peaceful demonstrators while they are engaged in lawful conduct in the exercise of their First Amendment Right to expression, speech, and assembly." (FAC, at ¶ 35).

No such policy or custom exists. (Moore Decl., ¶ 7). Allegations of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality. *Navarro* at

714. Furthermore, the facts establish probable cause for multiple crimes existed. That alone defeats the grounds for *Monell* liability.

5. The City has "a custom, practice, or policy of using deadly force when using less-lethal munitions against peaceful demonstrators." (FAC, at ¶ 36).

No such custom, policy or practice exists. (Moore Decl., ¶ 7). Proof of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality. *Navarro* at 714. The evidence shows less-lethal munitions were properly deployed at the ground as a means of crowd control during an unlawful protest on May 31, 2020. (Johnston Decl., ¶ 9). It was not deadly force that was used regardless of plaintiff's unfortunate injury.

6. The City has "a custom, practice, or policy of using deadly force when using less-lethal munitions against demonstrators whose skin color is Black or Brown." (FAC, at ¶ 37).

No such custom, policy or practice exists. (Moore Decl., ¶ 7). Proof of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality. *Navarro* at 714. Further, the evidence here shows munitions were deployed against a group, not against individuals of any kind of race. (Johnston Decl., ¶¶ 9-10). The video evidence shows a dark night and protesters of all races.

7. The City has "a custom or policy of failing to provide warnings before using chemical agents, less-lethal munitions, and injurious to deadly force against protesters. (FAC, at ¶ 38).

No such policy or custom exists. (Moore Decl., ¶ 7). Allegations of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality. *Navarro* at 714. The undisputed video evidence documents the multiple warnings given to the crowd.

8. The City has "a custom and/or policy of escalating and causing exigent circumstances which they use to justify their unreasonable use of force." (FAC, at ¶ 39).

No such policy or custom exists. (Moore Decl., ¶ 7). Proof of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality. *Navarro* at 714.

Plaintiff cannot show *any* of the above allegations reflect actual policies, practices, or customs of the City. Even if plaintiff made such a showing, she would also have to show City employees acted pursuant to the unconstitutional policies, practices, or customs *and* that such conduct was the cause of her injury. The evidence simply cannot support these allegations.

## VI.   A §1981 Claim is Generally Reserved for Contractual Relationships

Section 1981 ensures that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

"[A] plaintiff cannot state a § 1981 claim unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 470, 126 S. Ct. 1246, 1246 (2006). The Ninth Circuit also recognizes, "A plaintiff asserting a § 1981 claim must initially identify an impaired contractual relationship under which the plaintiff has rights." *Astre v. McQuaid*, 804 Fed. Appx. 665, 666 (9th Cir. 2020) (emphasis added). This can sometimes arise in the employment context – but no such facts are shown here.

Plaintiff fails to identify an impaired contractual relationship under which she has rights; therefore, this claim is inapplicable and should be dismissed.

//

//

**VII.    Claim for Declaratory Judgment is Redundant**

Plaintiff's ninth claim is for a Declaratory Judgment under 28 U.S.C. § 2201. Plaintiff requests this Court declare defendants violated her First and Fourth Amendment rights. (FAC, ¶ 103). Declaratory relief may be awarded under the Federal Declaratory Judgment Act which provides:

> [i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of an interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

"This is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 241, 73 S. Ct. 236, 239 (1952). "In effect, it brings to the present a litigable controversy which otherwise might only be tried in the future." *Societe de Conditionnement v. Hunter Eng. Co., Inc.*, 655 F.2d 938, 943 (9th Cir. 1981). Here, granting plaintiff's claim for declaratory judgment would be inconsistent with the purpose of the Act because plaintiff concurrently brings a fully mature cause of action for damages over the same facts.

Plaintiff seeks damages under § 1983 for violations of her constitutional rights. Plaintiff also seeks a declaration under the Federal Declaratory Judgment Act that defendants violated her First and Fourth Amendment rights. The determination of plaintiff's § 1983 action necessarily includes a finding on whether defendants violated her constitutional rights. There is no need for a declaratory judgment making this additional finding. Plaintiff's request for a declaration is duplicative of her § 1983 action, making declaratory relief inappropriate and this redundant claim should be dismissed.

//

STATE CLAIMS

I.  **Oregon Tort Claims Act**

A.  Individually Named Defendants Must Be Dismissed

As a threshold matter, under the Oregon Tort Claims Act, "the sole cause of action for a tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification under ORS 30.285 or 30.287 is an action against the public body." ORS 30.265(3). While some exceptions exist, they are not present here. See, e.g. ORS 30.265(4). Accordingly, the individually named defendants must be dismissed from plaintiff's state claims because there is no dispute they were acting within the scope of employment at all relevant times. (FAC, ¶¶ 6-10).

B.  Immunity for Defendants Arising from Riot, Civil Commotion, or Mob Action

The Oregon Tort Claims Act provides that defendants are "immune from liability" for "[a]ny claim arising out of riot, civil commotion or mob action or out of any act or omission in connection with the prevention of any of the foregoing." ORS 30.265(6)(e).

However the crowd might be characterized that evening, it certainly fits the category of "riot, civil commotion or mob action." Here, Lt. Van Meter authorized the use of less-lethal munitions after many people in the crowd refused to follow orders and had assaulted police officers. (Van Meter Decl., ¶ 12, Ex. 3) ("At 21:58 I authorized a gas deployment due to the riot now occurring."); (Moore Decl., Ex. 1, p. 7) ("At 2158 hours, Lt. VanMeter authorized the use of CS gas and other munitions on the unlawful protesters and those launching items at the officers."). The riot, civil commotion or mob action had initially begun when protesters occupied the Marion Street Bridge around 9:00 p.m. In direct response to protesters occupying the bridge, members of the MRT were deployed to "[p]rotect critical infrastructure, specifically the bridge."

(Warren Decl., Ex. 3, p. 4). Plaintiff's claims <u>all</u> arise from acts occurring *after* the riot, mob action and civil commotion began or occurred in connection with the prevention of these activities; consequently, the OTCA immunity applies, and defendants are immune from these claims. Judgment in favor of defendants should be granted on all state claims.

## II.    Intentional Torts – Assault, Battery, IIED

Even without immunity, Plaintiff's fifth, sixth, and seventh claims against the City and Officer Johnston for the intentional torts of Battery, Assault, and Intentional Infliction of Emotional Distress all fail.

### A.  Sixth and Seventh Claims – Battery and Assault

"[A]n assault is an intentional attempt by force to do violence to the person of another, and a battery is the actual application to such person of the attempted force and violence." *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 47, 293 P.2d 717, 723 (1956). Here, as examined above, plaintiff was (1) not struck by a Stinger round, and (2) if she was, there is no evidence it was not launched by Officer Johnston. Police officers performing their duty acting with apparent authority are also entitled to good faith immunity under ORS 30.265(6)(f). There are no facts to support any Jury question of malice by defendants.

### B.  Intentional Infliction of Emotional Distress

To prevail on this claim, plaintiff must prove "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus,* 321 Or. 532, 543, 901 P.2d 841 (1995). Police acting to disperse a crowd that threatened public and officer safety could not possibly rise to the level of intolerable conduct required for this claim. There is no evidence

Officer Johnston intended to inflict severe emotional distress on her because Officer Johnston never even targeted plaintiff. (Johnston Decl., ¶ 10) ("It would not have been possible to target non-white protesters, wearing masks, in the dark with CS gas or Stinger rounds that night."). The evidence examined above shows an unidentified protester caused her injury and any resulting emotional distress by apparently launching a projectile at her face.

No jury would find it socially intolerable for defendants to use reasonable force to control a violent crowd that threatened public safety. Individual rioters were not targeted by race. Officer Johnston chose to deploy Stinger rounds, not BIP rounds, because his objective was to gain the group's compliance, not an individual's compliance. (Johnston Decl., ¶¶ 9-10). If he needed to gain an individual's compliance, deployment of the blunt impact projectile ("BIP"; aka "baton" round) would have been his choice. *Id.*

## III.   Negligence

Plaintiff's eighth claim is for negligence against the City of Salem. A negligence claim requires plaintiff to prove: (1) that defendant's conduct caused a foreseeable risk of harm; (2) that the risk is to an interest of a kind that the law protects against negligent invasion; (3) that defendant's conduct was unreasonable in light of the risk; (4) that the conduct was a cause of plaintiff's harm; and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent. *Son v. Ashland Community Healthcare Services*, 239 Or. App. 495, 506, 244 P.3d 835, 841 (2010).

Plaintiff has no right to be protected by law from police deploying less-lethal munitions at the ground toward a group of rioters she marched with. The officers' conduct and use of force was reasonable in these circumstances. Further, there is insufficient evidence that a Stinger round

even caused her injury. The only eyewitness to this incident saw plaintiff "get hit in the head <u>with an object from the crowd</u>." (Morrison Decl., ¶ 5) (emphasis added).

## CONCLUSION

Plaintiff's claims require proving that Officer Johnston unlawfully shot a Stinger round at plaintiff's eye on May 31, 2020. The facts show Officer Johnston and others acted lawfully to control a crowd of unlawful protesters and that plaintiff was struck by an object thrown from the crowd. Officer Ramirez did not act unconstitutionally by rendering aid to plaintiff after she was injured. Defendants Moore and Powers, who were not present at any relevant time, never personally participated in depriving plaintiff of any constitutional rights. Plaintiff's state claims are actionable *only* against the City of Salem and should all be dismissed pursuant to the City's immunity provided by the Oregon Tort Claims Act. ORS 30.265(3)(6)(e).

Defendants respectfully request the Court grant defendants' Motion for Summary Judgment in its entirety and dismiss this case.

DATED this 27th day of August, 2021.

                                           s/ Gerald L. Warren
                                      _____
Gerald L. Warren, OSB #814146
Jennifer M. Gaddis, OSB #071194
Attorneys for Defendants

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT on:

> Kevin C. Braque
> The Brague Law Firm
> 4504 S. Corbett Ave., Ste. 200
> Portland, OR 97239
>     Attorney for Plaintiff

by the following indicated method or methods:

    ☒      by **electronic means through the Court's Case Management/Electronic Case File system** on the date set forth below;

           by **emailing** a copy thereof to each attorney at each attorney's last-known email address on the date set forth below;

           by **mailing** a full, true, and correct copy thereof in a sealed, first-class postage-prepaid envelope, addressed to plaintiff's last-known address listed above and depositing it in the U.S. mail at Salem, Oregon on the date set forth below.

DATED this 27th day of August, 2021.

                                      s/ Gerald L. Warren
                          Gerald L. Warren, OSB #814146
                          Of Attorneys for Defendants