## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

**ELEAQIA MCCRAE**,

               Plaintiff,

     v.

**CITY OF SALEM, CITY MANAGER STEVE POWERS, POLICE CHIEF JERRY MOORE, OFFICER KEVIN RAMIREZ,** and **OFFICER ROBERT JOHNSTON**,

               Defendants.

Case No. 6:20-cv-01489-IM

**OPINION & ORDER GRANTING DEFENDANTS' RULE 50 MOTION**

Kevin C. Brague, The Brague Law Firm, 4504 S Corbett Avenue, Suite 250, Portland, OR 97239. Attorney for Plaintiff.

Dan Atchinson, City of Salem, 555 Liberty St SE, Suite 225, Salem, OR 97301; Aaron Hisel, Law Offices of Montoya, Hisel and Associates, 901 Capitol St NE, Salem, OR 97301. Attorneys for Defendants.

**IMMERGUT, District Judge.**

       Before this Court is Defendants' renewed motion for judgment as a matter of law

pursuant to Federal Rule of Civil Procedure 50(b) on the basis that Defendant Officer Robert

Johnston ("Officer Johnston") is entitled to qualified immunity. Based on the evidence

introduced at trial and the jury's findings, this Court finds that Officer Johnston is entitled to

qualified immunity. While the jury found that Officer Johnston violated Plaintiff Eleaqia

McCrae's ("Plaintiff") Fourth Amendment right to be free from excessive force, the evidence presented at trial showed Officer Johnston used the Stinger 40-mm 60-Caliber Round ("Stinger round") in accordance with his training to disperse the crowd and did not intentionally target Plaintiff.

It is regrettable that Plaintiff suffered an injury while attending a protest on May 31, 2020. However, this Court finds that Plaintiff has not satisfied her burden of showing that there was clearly established law in existence at the time of the events at issue that a police officer violates the Fourth Amendment by using a Stinger round in the manner described and under the particular circumstances Officer Johnston confronted. Since Plaintiff has not demonstrated that existing precedent placed the constitutional question in this case beyond debate, and mindful that the United States Supreme Court mandates that clearly established law must be defined with particular specificity in the Fourth Amendment context, this Court finds that Officer Johnston is entitled to qualified immunity. Accordingly, Defendants' Rule 50 Motion, ECF 115, is GRANTED.

## BACKGROUND

On May 31, 2020, Plaintiff sustained injuries to her eye and chest while attending a protest in Salem, Oregon. ECF 16 at ¶¶ 29–30.

### A. Complaint

On August 31, 2020, Plaintiff filed this action in federal court raising numerous claims related to her injuries. ECF 1. On May 28, 2021, Plaintiff brought First Amendment and Fourth Amendment claims under 42 U.S.C. § 1983 against Officers Powers, Moore, Ramirez, and Johnston and *Monell* claims against the City of Salem. ECF 16 at ¶¶ 41–71. Plaintiff also brought racial discrimination claims under 42 U.S.C. § 1981 against Officers Powers, Moore, Ramirez, and Johnston, *id.* at ¶¶ 72–78, as well as state law claims for battery, assault, and

intentional infliction of emotional distress against the City of Salem and Officer Johnston and a state law claim for negligence against the City of Salem. *Id.* at ¶¶ 79–101. Finally, Plaintiff sought a declaratory judgment and attorney's fees as to the alleged violations of her First and Fourth Amendment rights. *Id.* at ¶¶ 102–106.

## B.  Summary Judgment and Qualified Immunity

On August 27, 2021, Defendants moved for summary judgment on all claims. ECF 25. Defendants argued that Plaintiff was in a group that was engaging in violent and unlawful protest, that Plaintiff did not state sufficient grounds to support a *Monell* claim against the City of Salem, and that the individual officers were entitled to immunity under the Oregon Tort Claims Act on Plaintiff's state law claims. *Id.* at 8. Defendants also argued that summary judgment should be granted as to Plaintiff's First and Fourth Amendment claims because, even if the individual officers committed constitutional violations, they were entitled to qualified immunity. *Id.* The Honorable Michael J. McShane granted summary judgment as to Plaintiff's First and Fourth Amendment claims under Section 1983 against Officers Powers, Moore, and Ramirez. ECF 65 at 6, 9. Judge McShane also granted summary judgment as to Plaintiff's *Monell* claim and intentional infliction of emotional distress claims. *Id.* at 14, 16. Finally, Judge McShane granted summary judgment as to Plaintiff's Section 1981 claim that she was intentionally targeted with less-lethal munitions based on her race—Judge McShane concluded: "The evidence is clear that less-lethal munitions were employed on the crowd at large due to the perceived threat to officers and public safety. While issues of fact remain as to whether the use of force was reasonable, nothing suggests that officers targeted individual protesters for any reason." *Id.* at 12.

Nonetheless, summary judgment was denied as to Plaintiff's First and Fourth Amendment claims under Section 1983 against Officer Johnston, Plaintiff's battery and assault

claims against the City of Salem and Officer Johnston, and Plaintiff's negligence claim against the City of Salem. *Id.* at 11, 15, 16. Judge McShane concluded that genuine issues of material fact precluded summary judgment as to these claims, including the nature of the crowd, whether Office Johnston caused Plaintiff's injury, and whether his use of force was reasonable. *Id.* at 10–11, 15. Judge McShane further concluded that "because the question of whether [Officer] Johnston's conduct violated a clearly established constitutional right turns on disputed facts, the Court cannot make a determination regarding qualified immunity at this stage." *Id.* at 11.

**C.  Trial and Jury Verdict**

On July 1, 2022, this case was reassigned to this Court. ECF 73. Through conferral of the parties, Plaintiff voluntarily dismissed her assault claims against the City of Salem and Officer Johnston, ECF 92 at 2, and this Court dismissed Plaintiff's negligence claim against the City of Salem as inconsistent with her Section 1983 claims. ECF 102 at 4–5. Before this case proceeded to trial on Plaintiff's remaining claims, Defendants requested that the jury's verdict form include special findings of fact to address two questions: (1) whether Officer Johnston caused Plaintiff's injury, and (2) whether Officer Johnston targeted Plaintiff. ECF 90 at 6. Plaintiff objected to the inclusion of special findings of fact. *Id.* at 8. However, this Court concluded that these findings would assist this Court in making a qualified immunity determination, if necessary.

On September 26, 2022, this case proceeded to trial on Plaintiff's First and Fourth Amendment claims against Officer Johnston and Plaintiff's battery claim against the City of Salem based on the conduct of Officer Johnston. ECF 103. After the close of the evidence, Defendants moved for judgment as a matter of law pursuant to Rule 50(a) on the basis that Officer Johnston was entitled to qualified immunity when he shot less-lethal munition (a Stinger round) to disperse the crowd on May 31, 2020. ECF 115 at 2. This Court denied Defendants' motion and sent this case to the jury, finding again that the jury's determination of the facts

would assist this Court in determining whether Officer Johnston was entitled to qualified immunity.

On September 30, 2022, the jury returned its verdict. First, the jury made the following special findings: (1) Plaintiff "prove[d] by a preponderance of the evidence that Officer Johnston shot her in the eye and chest," and (2) Plaintiff did not "prove by a preponderance of the evidence that Officer Johnston targeted her." ECF 114. The jury then found (1) Plaintiff did not prove by a preponderance of the evidence that Officer Johnston violated her First Amendment right to speech or lawful assembly, (2) Plaintiff proved by a preponderance of the evidence that Officer Johnston violated her Fourth Amendment right not to be subjected to excessive force, and (3) Plaintiff did not prove by a preponderance of the evidence that Officer Johnston committed Battery against Plaintiff. *Id.* On October 14, 2022, Defendants renewed their motion for a judgment as a matter of law pursuant to Rule 50(b). ECF 115. On October 27, 2022, Plaintiff filed a response. ECF 121. The conduct that forms the basis of Plaintiff's challenge is Officer Johnston's firing of a Stinger round towards the crowd on May 31, 2020.

## STANDARDS

### A.  Federal Rule of Civil Procedure 50

A court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. Rule Civ. Pro. 50(a); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). The standard for judgment as a matter of law under Rule 50 "mirrors the standard for summary judgment under Rule 56." *Reeves*, 530 U.S. at 150. Thus, in reviewing a Rule 50 motion, a court should review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party. *Id.* A court may not make any credibility determinations or weigh any evidence. *Id.*

A party seeking a judgment as a matter of law must file a Rule 50(a) motion before a case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). If the court does not grant a Rule 50(a) motion and the jury later returns a verdict against the moving party, this party may then renew its motion under Rule 50(b). Fed. R. Civ. P. 50(b). A Rule 50(b) motion may be considered only if a Rule 50(a) motion was previously made. *Id.*; *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir 2009). Defendants made a Rule 50(a) motion at the close of evidence at trial and properly preserved the Rule 50(b) motion currently before this Court.

## B. Qualified Immunity

Qualified immunity is a question of law that only a judge can decide. *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). The entitlement is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and should ordinally be decided by the court long before trial, *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Nonetheless, the issue of qualified immunity may be determined after a trial has already taken place. *Morales*, 873 F.3d at 823. In these cases, "a bifurcation of duties is unavoidable: only the jury can decide the disputed factual issues, while only the judge can decide . . . the [issue of qualified immunity] once the factual issues are resolved." *Id.* If the jury finds in favor of the plaintiff, the court must construe the trial evidence in the light most favorable to the plaintiff. *Id.* at 826.

"The doctrine of qualified immunity protects government officials from liability for civil damages . . . ." *Wood v. Moss*, 572 U.S. 744, 757 (2014); *see also Krainski v. Nev. ex rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts. And

reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (internal citation omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

In determining whether an officer is entitled to qualified immunity, courts in the Ninth Circuit employ a two-step test: first, they decide whether the officer violated a plaintiff's constitutional right; if the answer is "yes," they proceed to determine whether the right was clearly established. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011). In this case, a jury has already determined that Officer Johnston violated Plaintiff's Fourth Amendment right not to be subjected to excessive force. ECF 114. An officer who has violated the Fourth Amendment may nonetheless be entitled to qualified immunity so long as the officer did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Nelson v. City of Davis*, 685 F.3d 867, 883 (9th Cir. 2012); *see also Anderson*, 483 U.S. at 643. Thus, the issue before this Court is whether Officer Johnston's conduct was a violation of a clearly established right.

### 1. Clearly Established Right

"The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero v. Kitsap Cnty*, 931 F.2d 624, 627 (9th Cir. 1991); *see also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). If the plaintiff meets the burden of demonstrating that the right was clearly established, the burden shifts to the officer to prove that the conduct was reasonable even though it might have violated constitutional standards. *Romero*, 931 F.2d at 627; *see also LSO, Ltd.*, 205 F.3d at 1157.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Romero*, 931 F.2d at 627

("[T]he officer should prevail if the right asserted by the plaintiff was not 'clearly established' or

the officer could have reasonably believed that his particular conduct was lawful."). To answer

this question, courts look to factually similar cases. *A.K.H. rel. Landeros v. City of Tustin*, 837

F.3d 1005, 1013 (9th Cir. 2016) ("To determine whether [the officer] violated clearly established

law, we look to 'cases relevant to the situation [the officer] confronted.'") (*quoting Brosseau v.

Haugen*, 543 U.S. 194, 200 (2004)).

     "While courts do not require a case directly on point . . . existing precedent must have

placed the statutory or constitutional questions beyond debate." *Mattos*, 661 F.3d at 442 (*quoting

Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also City of Tahlequah, Oklahoma v. Bond*,

142 S. Ct. 9, 12 (2021) ("It is not enough that a rule be suggested by then-existing precedent; the

rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was

unlawful in the situation he confronted.") (internal quotation and citation omitted). Courts are not

to define clearly established law at a high-level of generality—instead, the inquiry "must be

undertaken in light of the specific context of the case, not as a broad general proposition."

*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation and citation omitted). "Such

specificity is especially important in the Fourth Amendment context, where it is sometimes

difficult for an officer to determine how the relevant legal doctrine, here excessive force, will

apply to the factual situation the officer confronts." *Id.* (internal quotation and citation omitted).[1]

---

[1] Plaintiff argues that the principle that the right can be clearly established even without
closely analogous case law applies with "especial vigor" in excessive-force cases because the
constitutional standard in excessive-force cases is very fact-specific. ECF 121 at 3 (citing
*Mattos*, 661 F.3d at 442). Plaintiff is correct that the Ninth Circuit in the 2011 *Mattos* case stated
that courts are "particularly mindful of this principle in the context of Fourth Amendment cases,
where the constitutional standard—reasonableness—is always a very fact-specific inquiry."
*Mattos*, 661 F.3d at 442. However, this statement in *Mattos* directly conflicts with the Supreme

However, officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelze*r, 536 U.S. 730, 741 (2022); *see also Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) ("[E]ven if there is no closely analogous case law, a right can be clearly established on the basis of 'common sense.'") (internal quotation and citation omitted). In novel factual circumstances, officers are not entitled to qualified immunity in obvious or egregious cases. *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (internal quotation and citation omitted).

## DISCUSSION

Plaintiff bears the burden of demonstrating that it was clearly established prior to May 31, 2020 that Officer Johnston's conduct would violate Plaintiff's Fourth Amendment rights. To make this determination, this Court will consider factually similar cases. *A.K.H. rel. Landeros*, 837 F.3d at 1013. But before doing so, this Court finds it necessary to review the facts, as established at trial and construed in the light most favorable to Plaintiff. *Morales*, 873 F.3d at 826.

---

Court's later instruction in the 2014 *Mullenix* case that specificity is especially important in excessive-force cases because the constitutional standard in excessive-force cases depends on the factual situation the officer confronts. *Mullenix*, 577 U.S. at 12. "[W]here the reasoning or theory of [a] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority," that precedent should be rejected as having been "effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). The reasoning in *Mattos* is clearly irreconcilable with the reasoning in *Mullenix* and thus has been effectively overruled by *Mullenix*. This Court is bound by the Supreme Court's mandate that the contours of the right must be defined with such specificity, *especially* in excessive force cases, as to make it clear to a reasonable officer that his conduct was unlawful in the particular circumstances he confronted.

## A.  Trial Evidence

On May 25, 2020, George Floyd was murdered by former Minneapolis Police Officer,

Derek Chauvin.[2] Following George Floyd's death, widespread protests took place in Oregon and

across the country.[3] In addition to thousands of peaceful demonstrations, episodes of unlawful

behavior occurred during several protests, including vandalism and looting as well as violent

confrontations with the police, including in Oregon.[4]

### 1.  Public Safety Interest

On May 31, 2020, Plaintiff attended a protest against the death of George Floyd in Salem,

Oregon.[5] At approximately 9:00 p.m., a group of demonstrators, including Plaintiff, marched

---

[2] The Associated Press, *Derek Chauvin guilty of murder in death of George Floyd*, THE OREGONIAN (Apr. 20, 2021), https://www.oregonlive.com/nation/2021/04/derek-chauvin-guilty-of-murder-in-death-of-george-floyd.html.

[3] The Associated Press*, Protests over George Floyd's death break out in NYC, all over country*, THE OREGONIAN (May 29, 2020), https://www.oregonlive.com/news/2020/05/protests-over-george-floyds-death-break-out-in-nyc-all-over-country.html.

[4] *See, e.g.*, Molly Harbarger | The Oregonian/OregonLive, *Riot erupts in downtown Portland after peaceful protest of George Floyd killing*, THE OREGONIAN (May 29, 2020), https://www.oregonlive.com/portland/2020/05/protest-escalates-at-downtown-portland-justice-center.html; Sudhin Thanawala, *Protests, some violent, spread in wake of George Floyd death*, ASSOCIATED PRESS (May 29, 2020), https://apnews.com/article/nv-state-wire-az-state-wire-co-state-wire-fl-state-wire-virus-outbreak-baf3b29612527b8e9a841cb34f6f5789.

[5] Prior to events involving Plaintiff, the Salem Police Department took many steps to prepare for the May 31, 2020 protests and prevent incidents. The Department's Community Engagement Team attempted to contact protest organizers, even though the protestors had not gone through the City's permitting process, to help plan and facilitate lawful assembly. These attempts were unsuccessful. Nonetheless, the Community Engagement Team continued attempting to find a protest leader to coordinate routes and other events for the evening. Lieutenant Jason Van Meter also contacted the hospital to increase staff and surgical teams in case of any injuries or accidents that may be associated with such a large crowd. He also communicated with Public Works to plan for any needed services and with the Marion County Sheriff's Jail to plan for any needed arrest teams. In addition, prior to the events described below, the police had allowed the crowd to march through Salem for hours without law

onto and occupied the Marion Street Bridge which connects West Salem with Downtown Salem.[6] *See* ECF 116-6 at 1 ("5/31/2020 21:01:08 . . . THEY ARE AT THE RAMP FOR THE BRIDGE . . . GOING OVER IT"; 5/31/2020 21:03:19 . . . THEY[']RE BL[OC]KING THE MARION STREET BRIDGE"). There are only two bridges that connect the two sides of Salem, which is divided by a river: the Marion Street Bridge, which services traffic traveling westbound only, and the Center Street Bridge, which services traffic traveling eastbound only. Together, these two bridges are the only ingress and egress in and out of Downtown Salem from the West. *See* ECF 116-1 at 19.[7]  The closest trauma center to West Salem, which has a population of 31,000 people, is east of the river in Downtown Salem. Thus, emergency vehicles must use the Center Street Bridge to get from West Salem to the hospital in Downtown Salem—or travel south of Salem and cross the river at one of the bridges in Independence or Corvallis, which would take significantly more time. Lieutenant Jason Van Meter of the Salem Police Department testified that the Center Street and Marion Street bridges have always been considered critical infrastructure, and the police had to keep the Center Street Bridge clear, or it would potentially cost somebody their life due to the delay in getting to the hospital.

---

enforcement intervention, blocking traffic for the demonstrators throughout the evening. *See, e.g.*, ECF 116-3 at 10.

[6] Officer Trevor Morrison testified that he got called in around the time that protestors took the bridge and, when he arrived, was advised that these protestors were throwing objects at patrol cars and donning gas masks.

[7] This Court has included citations to trial transcripts only where the parties have made those excerpts part of the record through attorney declarations attached to the parties' Rule 50 Motion briefing. *See* ECF 116; ECF 122; ECF 125. The parties included only brief excerpts from the trial testimony of some of the witnesses; this Court's citations should not be construed as representing that those citations are the only trial evidence regarding a particular fact.

After occupying the Marion Street Bridge, the demonstrators marched east off the bridge and back into Downtown Salem towards the Oregon State Capitol. However, shortly thereafter, the crowd began moving down Center Street back towards the bridges. Lieutenant Van Meter instructed members of the Salem Police Mobile Response Team ("MRT") to form a skirmish line at the intersection of Center Street and Liberty Street, about one block from the Center Street Bridge, to prevent the demonstrators from marching back onto the bridges.[8] The skirmish line was made up of approximately twenty-five to thirty officers. Plaintiff's own expert opined that, because the bridges are the only way in and out of Downtown Salem for emergency vehicles, it was a prudent decision to ensure that both bridges remained clear for vehicular traffic. *See* ECF 116-1 at 6, 11. Based on the above trial evidence, this Court finds that the Salem Police Department had a strong public safety interest in preventing the protestors from blocking the bridges again.

### 2. Dispersal Orders

As the protestors approached the skirmish line that was blocking access to the Center Street Bridge, the Salem Police Department declared the protest unlawful. Lieutenant Van Meter testified that he decided to declare the demonstration unlawful because, as the crowd was approaching the bridges for the second time, an ambulance was trying to cross the Center Street Bridge. In addition, Lieutenant Van Meter testified that, in deciding to declare the demonstration unlawful, he also considered the following: reports from the Community Engagement Team that they were being charged by some of the protestors and that those protestors had something in

---

[8] Lieutenant Van Meter also testified that he selected this intersection because it was about four to six blocks from the Capitol building—this gave the officers time to make announcements as the crowd approached and gave the protestors plenty of room to disperse and return to the Capitol.

their hands, reports of a disturbance on the bridge when the protestors had previously occupied the Marion Street Bridge, and other incoming emergency calls for service, including for a domestic disturbance, to which police resources needed to be allocated. He also testified that, prior the protest being declared unlawful, multiple officers had reported that they were taking projectiles from the crowd and that he personally observed a rock, water bottles, and a glass bottle being thrown at the officers.

Accordingly, at 9:52 p.m. police began announcements instructing the demonstrators that the assembly had been declared unlawful and that they were required to disperse. *See, e.g.*, ECF 116-6 at 2. These orders were given using a loud Public Address ("PA") system called a Long-Range Acoustic Device ("LRAD"). The trial evidence suggests that dispersal orders were given over the LRAD for at least several minutes. *See, e.g.*, ECF 116-6 at 2 (showing that dispersal orders began at 9:52 p.m. and that officers deployed gas towards the crowd at 9:58 p.m.). Plaintiff's own expert also testified that the dispersal orders went on for several minutes, ECF 116-1 at 12, and Defendants' expert testified that the dispersal orders were adequate because they gave demonstrators time to comply and warned that people who did not comply would be subject to arrest, ECF 116-3 at 10. However, Plaintiff's witnesses testified either that they did not hear the dispersal orders at the time or that it was hard to ascertain what was being said. Nonetheless, dispersal orders can be heard clearly and loudly in the videos to which the parties stipulated, including instructions that the protest had been declared an unlawful assembly, orders to turn around and walk away, and a request to stop throwing things at the officers. The fact that some of Plaintiff's witnesses testified that they did not hear or were confused by the dispersal orders does not undermine the objective evidence which demonstrates that dispersal orders were repeatedly given. Moreover, this Court finds that the evidence showed that the crowd had several

places to which they could retreat and were not impeded in any way from turning around and walking away.

### 3. Nature of the Crowd

Although the police instructed the demonstrators that the protest had been declared unlawful and ordered them to disperse, many in the crowd did not disperse. Then, the police skirmish line began moving forward towards the crowd. The nature of the crowd was a hotly contested issue at trial. Defendants' witnesses testified that members of the crowd threw water bottles, some of which were frozen or filled with nails, glass bottles, rocks, eggs, fireworks, and mortars at the officers. *See, e.g.*, ECF 122 at 5; ECF 122-7 at 3, 7. For example, Officer Andrew McFerron testified that a mortar thrown from the crowd landed underneath the police BearCat vehicle and, when it detonated, he felt the concussion of the blast. Officer Johnston also testified that, after 2-chlorobenzalmalononitrile ("CS") gas had been deployed towards the crowd, a demonstrator threw a CS canister back at the officers. ECF 122-7 at 10. Officer Johnston testified that he also observed another demonstrator equipping himself with protective gear, which he perceived as a threat to officer safety. Conversely, while Plaintiff's witnesses testified that some protestors threw eggs at officers earlier in the day and threw water bottles at officers around the time that Plaintiff was injured, there was no other violence among the crowd.

The parties stipulated to the admissibility of short snippets of multiple videos showing the confrontation between the demonstrators and the police skirmish line. *See* ECF 87 at 2–3; *see also* ECF 109 at 2–3. The videos show what appear to be well over one hundred people marching down Center Street toward the bridge. The videos show the protestors refusing to disperse although dispersal orders can be heard playing over the LRAD. Once the officers begin moving towards the crowd and at least one CS canister is deployed, the videos show a protestor, who was standing in very close proximity to Plaintiff, throw a smoking CS canister back at the officers.

*See* Ex. 110, 2:08; *see also* Ex. 114, 00:49. This Court also notes that one of Plaintiff's witnesses submitted a signed declaration as part of the parties' summary judgment briefing in which she confirmed that a member of the crowd threw a "tear gas canister . . . back at the police line." ECF 54 at ¶ 8. The videos also show members of the crowd throw at least a few unidentified objects, some of which appear to be water bottles, towards the officers around the time of Plaintiff's injury. Ex. 114, 00:32; Ex. 114, 1:02, Ex. 204, 10:34. The sound of shattering glass and shouting of obscenities as well as the sounds of various bangs can also be heard during the videos.

The parties also stipulated to the admissibility of the Response Report from the evening in question, which suggests that at least some members of the crowd were hostile towards the officers, including rushing police vehicles, throwing objects at the police, and putting on protective equipment. *See* ECF 116-6 ("05/31/2020 21:46:11 476: LARGE CROWD RUSHING PATROL CARS"; "05/31/2020 21:46:22 THEY HAVE ITEMS IN THEIR HANDS . . . RUSHING PATROL VEH[ICLES]"; "05/31/2020 21:53:56 THEYRE THROWING PROJECTILES"; "05/31/2020 21:58:38 TAKING PROJECTILES"; "05/31/2020 22:02:02 506: THEYRE THROWING FIREWORKS AT US"; 05/31/2020 22:02:38 PROTESTERS ARE SHOWING THEMSELVES PUTTING ON ELBOW PADS AND FACE MASKS"; "05/31/2020 22:04:20 LARGE EXPLOSION"; "05/31/2020 22:04:24 FIREWORK[S]").[9]

---

[9] The evidence suggests that Officer Johnston deployed CS gas sometime shortly after being instructed to do so at 9:58 p.m. Officer Johnston then deployed the Stinger round, and Plaintiff was injured, shortly thereafter. Therefore, Plaintiff could not have been injured until after 9:58 p.m., and these incidents took place right before (9:46 p.m., 9:53 p.m., 9:58 p.m.) and sometime shortly after Plaintiff was injured (10:02 p.m. and 10:04 p.m.).

Nonetheless, based on the camera viewpoints, the quality of the videos, and the fact that the protest took place at night when it was dark, the nature of the crowd was difficult to fully discern from the videos played at trial. Moreover, the video snippets played at trial were very brief and therefore offer limited insight into the totality of the circumstances confronting the officers. Nonetheless, based on the videos, the testimony, and the Response Report, and even construing the evidence in the light most favorable to Plaintiff, this Court finds that, while there is no evidence that Plaintiff was violent, some of the protestors engaged in violent behavior. Further, the undisputed evidence at trial established that the crowd had previously occupied the Marion Street Bridge, was marching in the direction of the Center Street Bridge, had been ordered to disperse, and was refusing to do so, creating a significant risk to public safety.

### 4. Deployment of Less Lethal Munitions: Stinger Round

Once dispersal orders were given for about six minutes and the crowd did not disperse, at around 9:58 p.m., Lieutenant Van Meter instructed the MRT grenadiers, who are responsible for deploying less-lethal munitions, to deploy GS gas. *See, e.g.*, ECF 116-6 at 2. Officer Johnston, who served as an MRT grenadier, hand tossed a CS canister towards the crowd—one of the demonstrators threw the smoking canister back towards the officers. *See* ECF 122-7 at 10. Officer Johnston then fired a Stinger round towards the crowd. He testified that he fired the Stinger round to protect his fellow officers from protestors who were throwing dangerous projectiles at the skirmish line. ECF 122-3 at 6. He further testified that he chose the Stinger round because "it's used to try to disperse the crowd"—"the exact point of using the Stinger round was to get the crowd to back up and stop throwing items at the officers." *Id.* at 6–7.

Both Defendants' and Plaintiff's experts explained that the Stinger round is typically used as a crowd management tool to disperse a non-compliant crowd. ECF 116-1 at 11–12; ECF 116-3 at 11. Each Stinger round contains eighteen small rubber balls that are expelled from a canister

and spread when the round is fired. ECF 122-2; *see also* ECF 116-1 at 5, 14; ECF 116-3 at 7. Plaintiff's expert testified that the trajectories of the rubber balls, once fired, are unpredictable. ECF 116-1 at 8. Thus, the weapon is designed for crowd dispersal, rather than as a direct impact weapon, and is meant to be fired towards the lower extremities. ECF 116-1 at 4–5; ECF 116-3 at 7.

Officer Johnston testified that he has only skip-fired Stinger rounds, meaning he fires the round at the ground so that the rubber balls ricochet off the ground, diffusing some of their kinetic energy to lesson their impact. *See* ECF 125-2 at 4, 6–7. Officer Johnston has participated in and instructed numerous MRT and grenadier trainings and testified that none of these trainings involved direct-firing a Stinger round. *Id.* at 6–7. Officer Johnston testified that Stinger rounds are not used to aim and hit a particular person. Fellow grenadier, Officer McFerron, also testified that the Salem Police Department trains grenadiers to use the Stinger round as a skip-fire weapon and that the purpose of the weapon is to fire towards the ground to cause people to back up. Like Officer Johnston, Officer McFerron testified that he has never been trained by the Salem Police Department to direct-fire a Stinger round at an individual. Similarly, the manufacturer's specifications instruct that the Stinger round is most widely used as a crowd management tool deployed at low trajectories or skip fired in the general direction of intended targets and is a "non-target specific" weapon. ECF 121-2. The specifications instruct that the Stinger round can be direct-fired, but only at low trajectories so that the "projectile spread" will not hit above the "breast line." *Id.*

### 5. No Targeting of Plaintiff

After the close of evidence, the jury found that at least one of the rubber bullets fired by Officer Johnston hit Plaintiff in the eye and chest. ECF 114 (Plaintiff proved "by a preponderance of the evidence that Officer Johnston shot her in the eye and chest"). However,

PAGE 17 – OPINION & ORDER

the jury also found that Officer Johnston did not target Plaintiff with the Stinger round. *Id.* (Plaintiff did not prove "by a preponderance of the evidence that Officer Johnston targeted her").

This Court finds the jury's special finding that Plaintiff was not targeted by Officer Johnston, coupled with the evidence presented at trial, demonstrates that Officer Johnston did not fire the Stinger round directly at Plaintiff and instead fired the round to disperse the crowd. This Court therefore finds that Officer Johnston fired the Stinger round consistent with his training and with the manufacturer's specifications regarding the weapon's intended purpose. While this Court recognizes that the jury found that Plaintiff was hit in the eye and chest with at least one of the rubber balls expelled from Officer Johnston's Stinger round, this Court has not identified any evidence in the record that suggests that Officer Johnston used the Stinger round contrary to his training.

**B. Legal Analysis**

   **1. Legitimacy of Jury's Special Finding**

Before considering whether Plaintiff has met her burden of demonstrating that it was clearly established that Officer Johnston's conduct would violate Plaintiff's Fourth Amendment rights, this Court must address Plaintiff's argument that the jury's special finding should be rejected. Plaintiff argues that this Court should ignore the jury's special finding and conclude that Officer Johnston indeed targeted Plaintiff. ECF 121 at 4; *see also id.* at 9. First, Plaintiff renews her objection to the use of special findings of fact on the verdict form. *Id.* at 4 n. 2. Second, Plaintiff contends that the jury's special finding is "rebutted," "nullifie[d]," and "render[ed] moot" by the jury's verdict that Officer Johnston violated Plaintiff's Fourth Amendment rights. *Id.* at 4. Relatedly, Plaintiff argues that the special finding is inconsistent with Ninth Circuit precedent establishing that a seizure under the Fourth Amendment must

include intentional conduct. *Id.* (citing *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012)).

First, Plaintiff's objection to the use of special findings of fact is unpersuasive—the Ninth Circuit has recognized the legitimacy of special interrogatories in cases where qualified immunity is at issue. *Morales*, 873 F.3d at 824 ("special interrogatories to the jury can be used to establish disputed material facts" in qualified immunity cases). Second, the jury's finding that Officer Johnston did not target Plaintiff is not nullified by their conclusion that Officer Johnston violated Plaintiff's Fourth Amendment rights, and it does not violate Ninth Circuit case law on Fourth Amendment seizures. Plaintiff is correct that the Ninth Circuit has explained that "government conduct must be purposeful" to constitute a Fourth Amendment seizure and "cannot be an unintentional act . . . ." *Nelson*, 685 F.3d at 876. However, Plaintiff misinterprets the distinction between unintentional and intentional conduct. Unintentional conduct, as defined by the Ninth Circuit, is accidental or "unknowing" conduct—it must "lack the element of volition." *Id.* (citation omitted). The jury did not conclude that Officer Johnston's conduct was unintentional in that it lacked volition—the jury merely concluded that Officer Johnston did not individually "target" Plaintiff. The jury's finding does not violate the Ninth Circuit's command that a Fourth Amendment seizure cannot be an unintentional act. This Court accepts the jury's special finding and declines to usurp the jury's role as factfinder. *See Morales*, 873 F.3d at 823 ("[O]nly the jury can decide the disputed factual issues . . . .").

### 2. Factually Similar Cases

The next step is for this Court to review factually similar cases to determine whether, based on these cases, it would have been clear to a reasonable officer that Officer Johnston's conduct was unlawful in the situation he confronted. *A.K.H. rel. Landeros*, 837 F.3d at 1013; *Saucier*, 533 U.S. at 202. Plaintiff bears the burden of demonstrating that existing precedent

placed the unlawfulness of Officer Johnston's conduct beyond debate. *Romero*, 931 F.2d at 627; *see also LSO, Ltd.*, 205 F.3d at 1157. Plaintiff's burden is especially heavy in excessive force cases where it is difficult for an officer to determine how the relevant legal doctrine will apply to the factual circumstances he confronts, and consequently, clearly established law must be defined with particular specificity. *Mullenix*, 577 U.S. at 12.

Plaintiff points this Court to a wide variety of cases and argues that the body of relevant case law can be synthesized to show that Officer Johnston was on notice that his conduct was unlawful. ECF 121 at 8. By contrast, Defendants argue that none of the cases proffered by Plaintiff, individually or collectively, address the circumstances faced by Officer Johnston or the type of munition used. ECF 124 at 4. Defendants contend that there was no exigency in any of the cases cited by Plaintiff, that none of the cases except *Nelson* involve a crowd, and that the munitions used in each of the cases were "[p]oint-of-aim-point-of-impact" weapons, rather than indiscriminate weapons. *Id.* at 4–5.

Because the constitutional standard in excessive force cases is very fact-specific, this Court will begin by reviewing the cases proffered by Plaintiff in detail. This Court will then compare these cases to the circumstances at the May 31, 2020 protest in Salem. Ultimately, this Court concludes that the cases proffered by Plaintiff do not address the circumstances in this case with sufficient specificity for five reasons: (1) Plaintiff has not pointed to any Supreme Court or Ninth Circuit precedent involving a Fourth Amendment claim regarding the use of a Stinger round; (2) unlike the officers in *Nelson*, Officer Johnston used the Stinger round in accordance with his training; (3) unlike any of Plaintiff's cases, the officers provided multiple audible dispersal warnings; (4) unlike any of Plaintiff's cases, there was a public safety exigency

motivating Officer Johnston's conduct; and (5) unlike any of Plaintiff's cases, the crowd presented at least some threat to officer safety.

### a. Review of Relevant Cases

The most relevant case proffered by Plaintiff is *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). In *Nelson*, a former student at University of California at Davis ("U.C. Davis"), was hit in the eye with a pepperball projectile fired by U.C. Davis and City of Davis police officers. *Id.* at 872. The plaintiff, along with about 1,000 other U.C. Davis students, had gathered for a party at an apartment complex. *Id.* at 872–73. Due to the size of the party, traffic around the complex became gridlocked and students began to park illegally. *Id.* at 873. Officers began issuing parking tickets and eventually moved in on the party to cite individual students for underage drinking. *Id.* Officers then "decided that they wanted a basis upon which to disperse the crowd" and contacted the owner of the apartment complex who requested that nonresidents be ordered to leave. *Id.* At this point, officers began individually informing students around the fringes of the gathering that they were required to leave. *Id.*

When this method proved ineffective, officers approached the party with a police vehicle. *Id.* This method was also ineffective, and some students threw bottles at the vehicle. *Id.* Thereafter, officers assembled in riot gear, some of whom were armed with pepperball guns: a weapon that fires small plastic balls which contain oleoresin capsicum ("OC") powder and are designed to burst open upon impact, releasing OC spray. *Id.* While the officers in *Nelson* contended that they issued a verbal order to disperse, they did not have any means of amplifying their voices. *Id.* Some of the officers gathered in front of a "very narrow and confined" breezeway where fifteen to twenty students, including the plaintiff, had congregated. *Id.* at 873–74. The students attempted to leave, but the police blocked their means of egress and did not provide any dispersal instructions. *Id.* at 874. No one in this group threw anything at the police,

and the students testified that they repeatedly asked the officers what they should do, raised their hands above their heads, and waited for instructions from the officers. *Id.* Some of the students began to cry. *Id.* Then, three officers fired multiple pepperballs at the group of students. *Id.* One of the pepperballs struck the plaintiff in the eye, causing permanent injury. *Id.*

The Ninth Circuit found that the officers used excessive force in violation of the Fourth Amendment. *Id.* at 883. The Court reasoned that the risk of harm and actual harm experienced by the plaintiff were significant, *id.* at 879, while the government interest in dispersing the party was "minimal," *id.* at 880. Neither plaintiff nor any of his companions were committing a crime at the time the plaintiff was shot, there was no exigency motivating the officers' actions, and the officers did not reasonably believe plaintiff or any of his companions posed a threat to officer safety or the safety of others. *Id.* at 879–881. Moreover, because the officers provided no instructions to the group in the breezeway and blocked their means of egress, the students' actions "[could] not be viewed even as passive non-compliance." *Id.* at 881.

The Ninth Circuit then concluded that the officers were not entitled to qualified immunity. *Id.* at 886. While there was no binding precent that specifically addressed the use of pepperball guns, it was clearly established that the officers' conduct was unreasonable under the circumstances. *Id.* at 884. Pepperball guns, "while a relatively new means of applying both pepper spray and concussive force to the target," merely combine two types of force that had already been recognized in the Ninth Circuit as unreasonable "when aimed at individuals who pose no threat and have committed, at most, minor offenses." *Id.* The Court explained that in the cases where the unreasonable application of a new form of force was not clearly established, "[the] holdings were premised on the fact that these particular methods represented novel means of applying pain." *Id.*

Plaintiff also relies on a number of cases that involve the use of less-lethal munitions but do not involve crowds or protests. For example, in *Deorle v. Rutherford*, officers responded to a call for service after the plaintiff, an emotionally unstable man, had become intoxicated and irate. 272 F.3d 1272, 1275–76 (9th Cir. 2001). When officers arrived at the scene, the plaintiff was verbally abusive but physically compliant and generally followed the officers' instructions. *Id.* at 1276. At one point, the plaintiff brandished a hatchet but threw the hatchet into a clump of trees when told by the officers to put it down. *Id.* He then picked up an unloaded plastic crossbow but also discarded it when told by the officers to put it down. *Id.* at 1277. After doing so, the plaintiff started walking towards one of the officers. *Id.* at 1277–78. When the plaintiff was approximately thirty feet away, the officer shot the plaintiff with a beanbag round fired from a twelve-gage shotgun. *Id.* at 1277; *see also id.* at 1277 n. 11. A beanbag round is a lead shot contained in a cloth sack. *Id.* at 1277. The round hit the plaintiff in the face, removed his left eye, and lodged the lead shot in his skull. *Id.* at 1278. The officer did not warn the plaintiff that he was going to shoot or order the plaintiff to halt. *Id.*

The Ninth Circuit found that the officer's use of force was unreasonable under the circumstances. *Id.* at 1285. The Court reasoned while the force used was obviously enough to cause grave physical injury, *id.* at 1279, the government interest in subduing an emotionally disturbed man who had committed no serious crime and presented no significant risk of flight was not substantial. *Id.* at 1282. The Court also pointed out that the officer made a "calculated and deliberate decision" to shoot the plaintiff and provided no warning or order to halt. *Id.* at 1283–84. The Court concluded that the officer was not entitled to qualified immunity even though there was no prior case prohibiting this specific type of force in these precise circumstances. *Id.* at 1285–86. The *Deorle* Court stated: "this is by no means a borderline

case . . . [e]very police officer should know that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285. The Ninth Circuit further reasoned that "closely analogous pre-existing case law [was] not required" because the officer's conduct was "so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional." *Id.* at 1286 (internal quotation and citation omitted).

Plaintiff also cites three cases that involve the use of tasers: *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011), *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013), and *Bryan v. MacPherson*, 630 F.3d 805 (2010). *Mattos* involved the use of a taser in stun mode three times in less than one minute on a plaintiff, who was seven months pregnant, and who had been pulled over for speeding in a school zone but refused to sign her traffic ticket. 661 F.3d at 444–45. The plaintiff refused to get out of her car but did not attempt to flee, did not act violently, and did not pose a threat the safety of officers or others, and there were no other exigent circumstances. *Id.* at 445–46.[10] *Mattos* also involved the use of a taser in dart mode without warning on a second plaintiff, the victim of a domestic dispute whom officers had come to protect, who at most could

_____

[10] Plaintiff also cites to *Rice v. Morehouse*, 989 F.3d 1112 (9th Cir. 2021) which involved pulling a plaintiff from his vehicle after he refused to get out following a traffic stop, implementing a "take-down" of the plaintiff, and holding the plaintiff on the ground before handcuffing him. ECF 121 at 13; *see Rice*, 989 F.3d at 1117. *Rice* was published after Officer Johnston's violation of Plaintiff's Fourth Amendment rights and therefore could not have put Officer Johnston on notice as to the unlawfulness of his conduct.

PAGE 24 – OPINION & ORDER

have been charged with obstruction, posed no threat to the officers, and was attempting to comply with the officers' orders. *Id.* at 449–52.

*Gravelet-Blondin* involved the use of a taser in dart mode on an elderly plaintiff who refused multiple commands to show the officers his hands, who also at most could have been charged with obstruction, posed no immediate threat to anyone's safety, and was "perfectively passive, engaged in no resistance, and did nothing that could be deemed 'particularly bellicose.'" 728 F.3d at 1089–92. The officer in *Gravelet-Blondin* started to warn the plaintiff but fired the taser before the finishing providing the warning. *Id.* at 1090. Plaintiff argues that *Mattos* and *Gravelet-Blondin* demonstrate that crimes like failure to disperse, which are on par with trespassing, obstruction, or failure to comply with an officer's order, are far from severe. ECF 121 at 11.

Likewise, *Bryan* involved the use of a taser in dart mode without warning on an emotionally disturbed plaintiff who was not facing the officer when he was shot, who at most could have been cited for misdemeanor offenses, and, despite his erratic behavior, was not resisting at all and did not pose an immediate threat to the officer or bystanders. 630 F.3d at 826–31. Plaintiff argues that *Bryan* demonstrates that resolving a potentially dangerous situation quickly does not justify force against someone who is not posing a threat or actively resisting. ECF 121 at 12.

Plaintiff also points to a case involving the use of pepper spray and baton blows on a plaintiff who had been pulled over for a seatbelt violation. *Id.* at 6, 12–13 (citing *Young v. Cnty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011)). In *Young*, the plaintiff had gotten out of his vehicle and was sitting on the curb eating broccoli, but refusing to get back into his vehicle, when an officer pepper sprayed him and struck him multiple times with a baton. *Id.* 1159–60.

The Ninth Circuit found that this use of force was unreasonable because the plaintiff presented no threat the officers, had been pulled over for a run-of-the-mill traffic offense, was at most committing the misdemeanor offense of interfering with a peace officer, and was not resisting arrest or attempting to flee. *Id.* at 1161–67.

### b. Assessment of Relevant Cases

Based on the above cases, this Court finds that Plaintiff has failed to meet her burden of showing that existing precedent provided Officer Johnston with the requisite level of guidance to put him on notice that using the Stinger round in the circumstances present on May 31, 2020 violated Plaintiff's Fourth Amendment rights. The cases cited by Plaintiff do not address with sufficient specificity Officer Johnston's conduct or the circumstances he confronted.

First, Plaintiff has pointed to no Supreme Court or Ninth Circuit decision involving a Fourth Amendment claim regarding the use of a Stinger round.[11] The fact that no binding cases deal with the precise type of force at issue in this case is not dispositive, and officers are not

---

[11] Plaintiff cites *Rodriguez v. Cnty. of Los Angeles*, 96 F. Supp. 3d 990 (C.D. Cal. 2014), *aff'd*, 891 F.3d 776 (9th Cir. 2018) for the principle that the use of Stinger rounds in response to Plaintiffs' refusal to comply with instructions was excessive force as a matter of law. ECF 121 at 11 n. 7. *Rodriguez*, however, arose from a disturbance in Los Angeles County Men's Central Jail, during which prison staff carried out violent cell extractions, which included, according to the Ninth Circuit, the use of a "40 mm block gun," "concussive grenades," "balls filled with pepper spray," and tasers as well as blows from punching and kicking. *Rodriguez*, 891 F.3d at 784–87. There is no mention of the use of a Stinger round in the Ninth Circuit opinion. The district court opinion, which was affirmed on appeal, does mention that the prison sergeants "directed the deployment of stinger rounds and stingball grenades" to carry out the cell extractions, but there is no other mention of the use of a Stinger round in the district court opinion. *Rodriguez*, 96 F. Supp. 3d at 1002–03. Indeed, the district court explicitly found that the defendants were not entitled to qualified immunity because the officers were "on notice . . . that intentionally harming *a prisoner* without a permissible purpose *violates the Eighth Amendment*." *Id.* at 1002. The present case, by contrast, involves neither prisoners nor an Eighth Amendment claim. This Court finds that the mere mention of an instruction to use a Stinger round in a district court opinion arising from a wholly different context than the circumstances Officer Johnston confronted did not contribute to a body of case law that would put Officer Johnston on notice that his conduct would violate the Fourth Amendment.

always insulated from liability each time a new type of weapon is used. However, this Court

finds that the Stinger round represents a novel means of applying pain that has not been

sufficiently addressed by any of the cases cited by Plaintiff. *See, e.g.*, *Bryan*, 630 F.3d at 833

(granting qualified immunity because prior to the date of the incident there was no Supreme

Court or Ninth Circuit decision addressing the use of a taser in dart mode). Unlike the weapons

at issue in the cases cited by Plaintiff, the Stinger round is an indiscriminate tool designed for

crowd dispersal—each trigger pull releases eighteen small rubber balls that spread out when the

round is fired. It is not a direct impact weapon designed to be fired at a specific target. By

contrast, the pepperball gun, the weapon at issue in *Nelson*, can be intentionally fired at the

ground to explode and release OC spray, but the weapon is not by its nature a necessarily

indiscriminate tool—the pepperball gun appears to be, as Defendants argue, a "point-of-aim-

point-of-impact" weapon and can fire up to seven rounds per second. ECF 116 at 6; ECF 124 at

4; *see Nelson*, 685 F.3d at 873. The beanbag gun, the weapon at issue in *Deorle*, is designed to

incapacitate a particular individual in order to effectuate an arrest—the beanbag gun is a twelve-

gage shotgun that fires a lead-filled cloth sack and also appears to be a "point-of-aim-point-of-

impact" weapon. ECF 124 at 4; *see also Deorle*, 272 F.3d at 1280; *id.* at 1287 (Silverman, J.,

dissenting). Similarly, tasers, pepper spray, and batons are targeted weapons used to incapacitate

a particular individual—not to disperse a non-compliant crowd. By contrast, this case involves

an indiscriminate crowd control munition and a plaintiff who was not specifically targeted with

that munition. Moreover, the cases cited by Plaintiff that do not arise in the context of crowd

control are factually distinct from the circumstances Officer Johnston confronted as an MRT

grenadier.

Second, unlike the officers in *Nelson*, Officer Johnston used the Stinger round in accordance with his training. *Nelson*, 685 F.3d at 885. In *Nelson*, the Court pointed out that the officers' own training on the use of pepperball guns put them on notice that they were not to target individuals from the distance involved, shoot individuals not posing a risk, or shoot at the ground to explode the pepperballs and release OC gas when the targeted area was populated by individuals. *Id.* at 878–79; *see also id.* at 885 n. 6. Indeed, the officers in *Nelson* testified in their depositions that they were aware of these limitations and safety concerns, and they nonetheless acted contrary to their training. *Id.* By contrast, the evidence at trial leads this Court to conclude that Officer Johnston fired the Stinger round in the manner the weapon is designed to be used—towards the ground to disperse the crowd—and, while Plaintiff was hit by an errant round, Officer Johnston did not specifically target Plaintiff.

Third, unlike the cases cited by Plaintiff, the officers in this case provided multiple audible dispersal orders. By contrast, in *Nelson*, the officers failed to give audible warnings or dispersal instructions to the students in the breezeway and even blocked their means of egress before firing at them. 685 F.3d at 874, 882–83. There is no evidence in this case that anything was preventing the demonstrators from turning around and walking away from the skirmish line. In fact, Lieutenant Van Meter testified that he chose the location for the skirmish line in part to provide the demonstrators with space to disperse and return to the Capitol building, and the videos show at least some demonstrators turning around and walking away. In *Deorle*, the officer neither warned the plaintiff that he was going to shoot nor even ordered the plaintiff to halt. 272 F.3d at 1281, 1283–84. And, in all of the taser cases cited by Plaintiff, as well as *Young*, the officers used their weapons without warning. *Mattos*, 728 F.3d at 439, 451; *Gravelet-Blondin*, 728 F.3d at 1090, 1092; *Bryan*, 630 F.3d at 822, 831; *Young*, 655 F.3d at 1165–66.

Fourth, unlike any of Plaintiff's proffered cases, the officers in this case had a strong public safety interest in protecting the bridges that connect West Salem to Downtown Salem to ensure that emergency vehicles could access the hospital. Plaintiff's own expert opined that it was a prudent decision to prevent protestors from advancing onto the bridges. ECF 116-1 at 6. By contrast, the Ninth Circuit in *Nelson* found that the government interest in dispersing a college party was "minimal" and that there was no other exigency motivating the officers' actions. 685 F.3d at 883, 886. In *Deorle*, the Ninth Circuit found that the government interest in subduing an emotionally disturbed man who had committed no serious crime and presented no significant risk was not substantial. 272 F.3d at 1282. And in each of the taser cases and in *Young*, the Ninth Circuit found that there was minimal government interest given that none of the plaintiffs had committed a serious offense or posed a threat to officer or public safety. *Mattos*, 661 F.3d at 444–45, 449–50; *Gravelet-Blondin*, 728 F.3d at 1091–92; *Bryan*, 630 F.3d at 826–30; *Young*, 655 F.3d at 1163–65.

Finally, while this Court recognizes that Plaintiff was not violent and many members of the crowd were not violent, the objective trial evidence demonstrates that there was some violence among the crowd, and Officer Johnston deployed less-lethal munitions on the crowd because he perceived a threat to officer safety.[12] While "a simple statement by an officer that he fears for his safety or the safety of others is not enough . . . objective factors [may] justify such a concern." *Deorle*, 272 F.3d at 1281. While this Court must be "careful not to attribute other protestors' actions to those plaintiffs who do not [provoke police], 'the context of the officers'

---

[12] *See also* ECF 65 at 12 (Judge McShane concluded in his summary judgment opinion: "The evidence is clear that less-lethal munitions were employed on the crowd at large due to the perceived threat to officers and public safety. While issues of fact remain as to whether the use of force was reasonable, nothing suggests that officers targeted individual protesters for any reason.")

actions must be considered." *Felarca v. Birgeneau,* 891 F.3d 809, 818 (9th Cir. 2018) (quoting *Nelson*, 685 F.3d at 886). In this case, objective factors, such as a demonstrator, standing in very close proximity to Plaintiff, who threw a smoking CS canister at the police skirmish line, justify Officer Johnston's concern and distinguish the context of Officer Johnston's actions from the circumstances confronted by the officers in the cases cited by Plaintiff.

In *Nelson*, the Ninth Circuit pointed out that no one in the group at which the officers shot had thrown anything at the officers—the students asked the officers what they should do, raised their hands above their heads, and some of them had even begun to cry. 685 F.3d at 874. In fact, unlike the present case, the Court stated that the actions of the students in the breezeway could not have involved "failure to comply with orders" and could not even be viewed as "passive non-compliance." *Id.* at 881. In *Deorle*, while the plaintiff was certainly acting erratically, he had generally complied with all of the officers' orders and was unarmed at the time he was shot. 272 F.3d at 1276, 1282. Likewise, the plaintiffs in the taser cases and in *Young* posed no threat whatsoever to the officers or to the public. *Mattos*, 661 F.3d at 444, 449; *Gravelet-Blondin*, 728 F.3d at 1091; *Bryan*, 630 F.3d at 827; *Young*, 655 F.3d at 1163–64.

For the above reasons, this Court concludes that the cases cited by Plaintiff have not placed the constitutional question at issue in this case beyond debate. Fourth Amendment excessive force cases require a fact-intensive analysis that turns on the specific circumstances of each use of force, and this Court is mindful that the Supreme Court has instructed courts to define clearly established law with particular specificity in excessive force cases. *See Mullenix*, 577 U.S. at 12. In reviewing the existing precedent, this Court must consider the specific facts of the present case. Based on the existing precedent, this Court cannot distill a rule so clearly

defined as to put Officer Johnston on notice that his actions would amount to excessive force. Nor is this such an obvious or egregious case where, notwithstanding the lack of judicial guidance at the time of Plaintiff's injury, the conduct at issue was so clearly violative of the constitutional right that a reasonable officer should have known his actions were unconstitutional without guidance from the courts.

### c.  Officer Johnston's Use of Stinger Rounds Was Not Deadly Force

Finally, this Court notes that Plaintiff argues that Officer Johnston used the Stinger weapon improperly, which transformed this less-lethal weapon into a lethal one. ECF 121 at 6–7, 11, 13. Plaintiff, therefore, proffers cases on the use of deadly force to show that it would have been clear to a reasonable officer that Officer Johnston's conduct was unconstitutional. *Id.* (*citing Tennessee v. Garner*, 471 U.S. 1, 20–21 (1985) (finding that shooting an unarmed, non-dangerous fleeing suspect in the back with a firearm was unreasonable); *Longoria v. Pinal Cnty.*, 873 F.3d 699, 709 (9th Cir. 2017) (finding that shooting an unarmed suspect in the back with a firearm as the suspect was raising his hands above his head was unreasonable); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (concluding that an officer should provide a warning whenever practicable before using deadly force and that a jury could find that shooting a suspect in the head with a firearm without warning was unreasonable)).

Plaintiff's argument is unsupported by the evidence at trial. Experts for both parties described the Stinger round as a less-lethal munition typically used for crowd control. While this Court must construe the evidence in the light most favorable to Plaintiff, this Court is not required to accept Plaintiff's characterization of the evidence. As addressed above, the trial evidence and the jury's special finding demonstrate the Officer Johnston fired the Stinger round

toward the ground in front of the crowd at large as the weapon is designed: for dispersal.[13] While less-lethal weapons may be lethal under some circumstances, that does not convert the use of crowd control weapons under all circumstances into the use of deadly force. Accordingly, the cases proffered by Plaintiff about the use of deadly force are not sufficiently similar to this case as to put Officer Johnston on notice that his conduct amounted to excessive force.

This Court concludes that a reasonable officer would not have been on notice that using the Stinger round in accordance with the officer's training and in the circumstances Officer Johnston confronted would violate Plaintiff's Fourth Amendment right to be free from excessive force.

## CONCLUSION

As described in detail above, the police had a strong public safety interest in preventing the protest from continuing to advance towards the bridges, the police provided audible dispersal orders, the crowd did not disperse, officers began moving towards the crowd, and at least some of the crowd responded violently. Officer Johnston fired the Stinger round to disperse the crowd in accordance with his training and did not target Plaintiff. And as noted above, although it is regrettable that Plaintiff suffered an injury at the protest, this Court finds that Plaintiff has not met her burden of demonstrating that it was clearly established by existing judicial precedent that a police officer violates the Fourth Amendment under these circumstances. Since Plaintiff has not demonstrated that existing precedent placed the constitutional question in this case beyond debate, and mindful that clearly established law must be defined with particular specificity in the

---

[13] When used in this manner, the Stinger round is not deadly force as defined in this circuit: "force that creates a substantial risk of causing death or serious bodily injury." *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005); *see also Bryan*, 630 F.3d at 825 (observing that tasers, stun guns, pepper spray, and blows from a baton are non-lethal force).

Fourth Amendment context, this Court finds that Officer Johnston is entitled to qualified immunity. Accordingly, Defendants' Rule 50 Motion, ECF 115, is GRANTED.

**IT IS SO ORDERED**.

DATED this 10th day of March, 2023.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge